# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.,
STATES OF WEST VIRGINIA, NORTH DAKOTA, *et al.*,

*Plaintiffs-Appellants,*

v.

MERRICK B. GARLAND, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of North Dakota
The Honorable District Court Judge Daniel L. Hovland
Case No. 1:23-cv-0024-DLH-CRH

## BRIEF FOR PLAINTIFFS-APPELLANTS

PATRICK MORRISEY
Attorney General
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

Stephen J. Obermeier
Thomas M. Johnson, Jr.
Michael D. Faucette
Jeremy J. Broggi
Boyd Garriott
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000
Fax: 202.719.7049
SObermeier@wiley.law

*Additional counsel on signature page*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

Appellees (collectively, "ATF") imposed a sweeping rule that aggressively regulates millions of guns equipped with a popular and long-accepted accessory called a stabilizing brace. In this appeal, Appellants ask this Court to reverse the district court's order declining to preliminarily enjoin that unjustified rule. Among other things, the district court erred in finding that Appellants were unlikely to succeed on the merits because it (i) failed to address Appellants' arguments that ATF's rule conflicts with the National Firearms Act and the Gun Control Act; (ii) held that the rule of lenity did not apply, despite acknowledging substantial ambiguities in key statutory terms on which ATF reversed its longstanding position; (iii) determined in conclusory fashion—and contrary to the Fifth Circuit in *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023)—that the rule was not arbitrary despite the agency's significant analytical errors; and (iv) found ATF's adjudications non-final despite the agency's representations in the record that the adjudications were final.

Given how many issues ATF's sweeping rule raises, Appellants believe that oral argument would assist the Court and respectfully request 20 minutes per side.

i

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1.A, Appellants state as follows:

1.  Appellant Firearms Regulatory Accountability Coalition, Inc. ("FRAC") has no parent corporation, and no publicly held company has any ownership interest in FRAC.

2.  Appellant NST Global, LLC (d/b/a SB Tactical) ("SB Tactical") has no parent corporation, and no publicly held company has any ownership interest in SB Tactical.

3.  Appellant B&T USA, Inc. ("B&T") has no parent corporation, and no publicly held company has any ownership interest in B&T.

Appellate Case: 23-3230     Page: 3     Date Filed: 11/16/2023 Entry ID: 5336284

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT .................................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS .................................................................... iii

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ............................................................................ 1

JURISDICTION ............................................................................... 2

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE ............................................................. 3

      A.   The National Firearms Act And The Gun Control Act. ............. 3

      B.   ATF's Prior Practice Allowing Stabilizing Braces. ................... 5

      C.   ATF's Reversal Under The Rule. .......................................... 9

      D.   ATF's Entrenchment Through Dozens Of Adjudications. ....... 12

      E.   The District Court Denies Preliminary Relief. ...................... 12

      F.   The Fifth Circuit Grants Preliminary Relief. ........................ 14

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ................................................................................. 20

  I.   Standard Of Review ...................................................... 20

  II.  The District Court Wrongly Rejected Appellants' Likely Success On The Merits. ................................................... 21

      A.   The Rule Exceeds ATF's Statutory Authority ...................... 21

      B.   The Rule Adopts Otherwise Unlawful Factors. .................... 33

      C.   The Adjudications Are Unlawful And Confirm The Rule Is Arbitrary. .................................................................... 48

  III.  The District Court Failed To Address Appellants' Irreparable Harm. ......................................................... 52

  IV.  The District Court Failed To Address The Balance Of Harms And Public Interest. .................................................... 56

CONCLUSION .............................................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Association of Realtors v. HHS*,
141 S. Ct. 2485 (2021)..........................................................................57

*Alliance for Hippocratic Medicine v. FDA*,
78 F.4th 210 (5th Cir. 2023) ...............................................................52

*American Farm Bureau Federation v. EPA*,
836 F.3d 963 (8th Cir. 2016) ..............................................................48

*Anglers of the AU Sable v. U.S. Forest Service*,
402 F. Supp. 2d 826 (E.D. Mich. 2005) ............................................55

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018).....................................................39, 45

*Baker Electric Cooperative, Inc. v. Chaske*,
28 F.3d 1466 (8th Cir.1994) ...............................................................54

*Bennett v. Spear*,
520 U.S. 154 (1997).......................................................................48, 49

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023).........................................................................24

*Britto v. ATF*,
2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) ....................................15

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) ..........................................................31, 32

*Citizens Telecommunications Company of Minnesota, LLC v. FCC*,
901 F.3d 991 (8th Cir. 2018) ..............................................................46

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980)............................................................50

iv

*Cohen v. California,*
403 U.S. 15 (1971) ................................................................................44

*Constellation Mystic Power, LLC v. FERC,*
45 F.4th 1028 (D.C. Cir. 2022) ....................................................37, 39

*D.M. by Bao Xiong v. Minnesota State High School League,*
917 F.3d 994 (8th Cir. 2019) ........................................................56, 57

*Dakotans for Health v. Noem,*
52 F.4th 381 (8th Cir. 2022) ................................................................20

*Dataphase Systems, Inc. v. C L Systems, Inc.,*
640 F.2d 109 (8th Cir. 1981) ...............................................................20

*Decker v. Northwest Environmental Defense Center,*
568 U.S. 597 (2013) ..............................................................................13

*Department of Commerce v. New York,*
139 S. Ct. 2551 (2019) .........................................................................50

*DHS v. Regents of the University of California,*
140 S. Ct. 1891 (2020) ...................................................................47, 50

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..............................................................................33

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ..............................................................................50

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC,*
140 S. Ct. 1637 (2020) .........................................................................23

*Guedes v. ATF,*
140 S. Ct. 789 (2020) ...........................................................................32

*Hardin v. ATF,*
65 F.4th 895 (6th Cir. 2023) ...........................................3, 18, 31, 32

*Hawkes Co. v. U.S. Army Corps of Engineers,*
782 F.3d 994 (8th Cir. 2015) ...............................................................49

v

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) .................................................................................23

*Innovator Enterprises, Inc. v. Jones*,
  28 F. Supp. 3d 14 (D.D.C. 2014) .......................................18, 27, 42, 43

*International Association of Sheet Metal, Air, Rail, & Transportation*
  *Workers v. Iowa Northern Railway Co.*,
  37 F.4th 1399 (8th Cir. 2022) ...............................................................24

*Iowa Utilities Board v. FCC*,
  109 F.3d 418 (8th Cir. 1996) ...................................................52, 53, 54

*Johnson v. Minneapolis Park & Recreation Board*,
  729 F.3d 1094 (8th Cir. 2013) ...............................................................56

*Kearney Regional Medical Center, LLC v. HHS*,
  934 F.3d 812 (8th Cir. 2019) ...................................................36, 38, 51

*Kroupa v. Nielsen*,
  731 F.3d 813 (8th Cir. 2013) .................................................................54

*LeMoyne-Owen College v. NLRB*,
  357 F.3d 55 (D.C. Cir. 2004) .........................................................34, 36

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ...................................................................................30

*Lomont v. O'Neill*,
  285 F.3d 9 (D.C. Cir. 2002) ...................................................................21

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ................................................................53

*Michigan v. EPA*,
  576 U.S. 743 (2015) ...............................................................................46

*Mock v. Garland*,
  2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) .............................*passim*

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ......................................................*passim*

vi

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ........................................................................37

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
970 F.3d 1010 (8th Cir. 2020) ........................................................20

*Nebraska v. Biden*,
52 F.4th 1044 (8th Cir. 2022) .........................................................57

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022) ...................................................................32

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................56

*Noem v. Haaland*,
542 F. Supp. 3d 898 (D.S.D. 2021) ................................................55

*Owner-Operator Independent Drivers Association v. FMCSA*,
494 F.3d 188 (D.C. Cir. 2007) ........................................................46

*Parents Defending Education v. Linn Mar Community School District*,
83 F.4th 658 (8th Cir. 2023) ...........................................................20

*Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*,
558 F.2d 861 (8th Cir. 1977) ..........................................................56

*R.J. Reynolds Vapor Co. v. FDA*,
65 F.4th 182 (5th Cir. 2023) ...........................................................54

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......................................................................24

*Record Head Corp. v. Sachen*,
682 F.2d 672 (7th Cir. 1982) .....................................................29, 35

*Restaurant Law Center v. United States Department of Labor*,
66 F.4th 593 (5th Cir. 2023) ...........................................................54

*Sekhar v. United States*,
570 U.S. 729 (2013) .......................................................................31

vii

Appellate Case: 23-3230    Page: 8    Date Filed: 11/16/2023 Entry ID: 5336284

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016)................................................................8

*Spirit Airlines, Inc. v. FAA*,
    997 F.3d 1247 (D.C. Cir. 2021)..........................................................40

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) ..........................................................55

*Texas Gun Rights v. ATF*,
    No. 4:23-cv-00578, ECF No. 36 (N.D. Tex. Oct. 4, 2023) .................16

*Texas v. ATF*,
    2023 WL 7116844 (S.D. Tex. Oct. 27, 2023) ....................................15

*Tobacco Accessories & Novelty Craftsmen Merchants Association of*
    *Louisiana v. Treen*,
    681 F.2d 378 (5th Cir. 1982) ..............................................................29

*Tripoli Rocketry Association v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006).........................................................*passim*

*U.S. Postal Service v. Postal Regulatory Commission*,
    785 F.3d 740 (D.C. Cir. 2015)............................................................34

*Union Pacific Railroad Co. v. DHS*,
    738 F.3d 885 (8th Cir. 2013) ..............................................................33

*United States v. Biro*,
    143 F.3d 1421 (11th Cir. 1998) ..........................................................29

*United States v. Buford*,
    54 F.4th 1066 (8th Cir. 2022) .............................................................30

*United States v. Fix*,
    4 F. App'x 324 (9th Cir. 2001) ...........................................................23

*United States v. Harris*,
    959 F.2d 246 (D.C. Cir. 1992).............................................................4

*United States v. Lim*,
    444 F.3d 910 (7th Cir. 2006) ..............................................................38

Appellate Case: 23-3230    Page: 9    Date Filed: 11/16/2023 Entry ID: 5336284

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) ..........................................................................24, 25

*United States v. Mead Corp.,*
   533 U.S. 218 (2001).....................................................................................34

*United States v. Thompson/Center Arms Co.,*
   504 U.S. (1992)...............................................................17, 18, 28, 30

*VanDerStok v. Garland,*
   2023 WL 7403413 (5th Cir. Nov. 9, 2023) ..................................................*passim*

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982).........................................................3, 17, 26, 28

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ......................................................................57

*Ysleta Del Sur Pueblo v. Texas,*
   142 S. Ct. 1929 (2022)...............................................................................24

*Yukutake v. Connors,*
   2021 WL 4342320 (D. Haw. Sept. 23, 2021)...................................................55

**Statutes**

5 U.S.C. § 702.................................................................................................53

5 U.S.C. § 706.................................................................................................3

18 U.S.C. § 921 ............................................................................................*passim*

18 U.S.C. § 922.............................................................................................4, 8

18 U.S.C. § 924.............................................................................................8

18 U.S.C. § 926.............................................................................................46

26 U.S.C. § 5812..........................................................................................3, 8

26 U.S.C. § 5822..........................................................................................3, 8

26 U.S.C. § 5841..........................................................................................3, 8

ix

26 U.S.C. § 5845 ............................................................................*passim*

26 U.S.C. § 5871 ........................................................................................8

26 U.S.C. § 7805 ......................................................................................46

28 U.S.C. § 1292 ........................................................................................2

28 U.S.C. § 1331 ........................................................................................3

**Regulatory Materials**

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
Final Rule, 88 Fed. Reg. 6,478 (Jan. 31, 2023) ...........................*passim*

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
Notice of Proposed Rulemaking, 86 Fed. Reg. 30,826 (June 10,
2021) ........................................................................................*passim*

**Other Authorities**

Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp.
Pres. Doc. 298 (Apr. 8, 2021) ..........................................................1, 24

U.S. Patent No. 8,869,444 B2 (issued Oct. 28, 2014) .........................5, 27

United States Br. 5, *United States v. Miller*, 307 U.S. 174 (1939),
1939 WL 48353 ................................................................................21

x

# INTRODUCTION

For more than a decade, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authorized the public to use pistol stabilizing braces, a popular firearms accessory, without federal regulation. ATF repeatedly issued letter rulings assuring manufacturers and the public that a stabilizing brace does not alter a gun's classification as a pistol under federal law. Relying on those assurances, millions of Americans have for years lawfully purchased stabilizing braces and pistols equipped with stabilizing braces from authorized manufacturers—all with ATF's full knowledge and express approval.

Then everything changed. Frustrated with perceived congressional inaction, President Biden ordered ATF to abandon its longstanding practice and "to treat pistols modified with stabilizing braces" as "subject to the National Firearms Act." Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 (Apr. 8, 2021). ATF complied by promulgating the Rule here, which purports to provide "factoring criteria" to "clarify" how ATF will determine whether a gun is subject to enhanced regulation. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule").

In actuality, the Rule guarantees ATF will reach the predetermined result: a vast new regulatory scheme that restricts braced pistols by recharacterizing them as short-barreled rifles. According to ATF's own estimates, the Rule will cover 99%

1

of braced pistols (while offering no examples of braced pistols that will escape regulation), eliminate 750,000 firearms, cost private parties $5 billion, and shutter four-of-five brace manufacturers. App. 189, 224, 230-35, 244-45; R.Doc. 1-5 at 21, 56, 62-67, 76-77. The Rule's targets include commercial Appellants, who waited seven months for the district court to decide their motion for preliminary relief while the market for pistol braces evaporated. It also includes individuals and twenty-five States represented here—who have had to choose between complying with the unlawful Rule or risking federal criminal prosecution.

That these drastic consequences do not result from any legislative change should give the Court serious pause. Already, the Fifth Circuit has held that the Rule "violates the [Administrative Procedure Act]," *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023), which it certainly does. The Rule also violates the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), neither of which purports to authorize the actions ATF has taken. And the district court's conclusory analysis—which simply ignores many of Appellants' arguments—is unpersuasive. This Court should reverse the district court and remand with instructions to preliminarily enjoin ATF from enforcing the Rule.

## JURISDICTION

This Court has appellate jurisdiction over the district court's denial of a preliminary injunction. 28 U.S.C. § 1292(a)(1). That order was issued on

2

September 12, 2023, and Appellants timely filed their notice of appeal on October 5, 2023.  The district court had subject-matter jurisdiction because this action arises under federal law.  *See* 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in failing to preliminarily enjoin the Rule and adjudications when they exceed ATF's statutory authority and are otherwise arbitrary and capricious.

The most apposite cases are: *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982); *Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023); and *Tripoli Rocketry Association v. ATF*, 437 F.3d 75 (D.C. Cir. 2006).  The most apposite constitutional and statutory provisions are 26 U.S.C. § 5845; 18 U.S.C. § 921; and 5 U.S.C. § 706.

## STATEMENT OF THE CASE

### A.    The National Firearms Act And The Gun Control Act.

The NFA and GCA heavily regulate short-barreled rifles.  Under the NFA, a covered "firearm" is subject to making and transfer fees and must be registered in the National Firearms Registration and Transfer Record.  26 U.S.C. §§ 5812, 5822, 5841, 5845.  The NFA defines a "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels

3

of less than 16 inches in length." 26 U.S.C. § 5845(a)(3), (a)(4). (The NFA also defines a "firearm" to include a short-barreled shotgun or machinegun, weapons not relevant here.) But the NFA makes clear that an ordinary gun—such as a rifle, shotgun, pistol, or revolver—is not an NFA "firearm." *See Mock*, 75 F.4th at 567 ("the NFA's definition of 'firearm' does not include pistols"); *United States v. Harris*, 959 F.2d 246, 261 (D.C. Cir. 1992) (distinguishing "a gun of some kind" from "a firearm within the meaning of the [NFA]"), *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001).

Along with the NFA's requirements, the GCA also restricts the transportation, sale, and delivery of any "short-barreled rifle." 18 U.S.C. § 922(a)(4), (b)(4). Like the NFA's "firearm" definition, the GCA defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length" and as "any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The GCA regulates the business of importing, manufacturing, or dealing in firearms generally. But it imposes enhanced regulations on a "short-barreled rifle," a "short-barreled shotgun," or a "machinegun." 18 U.S.C. § 922. The GCA also defines a "handgun," 18 U.S.C. § 921(a)(30), "but did not include any additional restrictions on them," *Mock*, 75 F.4th at 570. Both the NFA and the GCA define the subordinate term "rifle" as "a weapon designed or redesigned, made

4

or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

**B.    ATF's Prior Practice Allowing Stabilizing Braces.**

In 2012, Appellant SB Tactical developed the original Pistol Stabilizing Brace® to promote shooting inclusion for service-disabled military veterans. *See* Rule, 88 Fed. Reg. at 6,479, 6,482-83. Stabilizing braces are orthotic devices that attach to the rear of a firearm and allow the shooter to secure the pistol against their forearm. App. 450; R.Doc. 1-14, at 1. They consist of a strap and a cuff made of elastomer material. *Ibid.* This extra support allows users to more safely and accurately fire handguns. *Ibid.*



App. 42; R.Doc. 1, at 23; *see* Forearm-gripping stabilizing attachment for a handgun, U.S. Patent No. 8,869,444 B2 (issued Oct. 28, 2014).

Users include combat veterans like Appellant Richard Cicero. Mr. Cicero lost two limbs serving his country in Afghanistan. App. 413; R.Doc. 1-9, at 1. Mr.

5

Cicero now needs a stabilizing brace to fire a pistol safely and effectively. App. 444;

R.Doc. 1-13, ¶ 5.



App. 419; R.Doc. 1-9, at Fig. 3a.

Also a certified firearms instructor, Mr. Cicero has trained hundreds of wounded warriors to shoot a pistol using a brace:



6



App. 360; R.Doc. 1-8, at 11.

Stabilizing braces also "allow able-bodied shooters, including beginning shooters and shooters with less physical strength"—such as the elderly—to "more safely use" pistols. App. 414; R.Doc. 1-9, at 2; *see also* App. 371; R.Doc. 1-8, at 22 n.88; App. 451; R.Doc. 1-14, at 2.

Before bringing its stabilizing device to market, SB Tactical procured a classification letter from ATF concluding that attaching a stabilizing brace to a pistol "would not alter the classification of a pistol or other firearm" and that "such a

7

firearm *would not be* subject to NFA controls." *Id.* at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012) (emphasis in original letter)). Furthermore, ATF recognized that a stabilizing brace differs from a shoulder stock because a "'brace,' when attached to a firearm, d[oes] 'not convert that weapon to be fired from the shoulder.'" *Ibid.* This ruling set "forth the agency's official position concerning the status of [braced pistols] under Federal firearms laws." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 (1st Cir. 2016) (quoting ATF's NFA Handbook).

The ruling was highly consequential. An NFA "firearm" owner is required to provide ATF with his fingerprints, 26 U.S.C. § 5812(a)(3); subject himself to registration in a federal database, *id.* § 5841(b); and pay applicable making and transfer fees, *id.* §§ 5812(a)(2), 5822(b). Similarly, a GCA "short-barreled rifle" owner must obtain a "specific[] authoriz[ation] by the Attorney General" before transferring the gun across state lines, 18 U.S.C. § 922(a)(4), among other things. It is a felony to violate the NFA or GCA, punishable by up to a decade in prison. *See* 26 U.S.C. § 5871; 18 U.S.C. §§ 924(a)(1)(B), (D), 3571(c)(3), 3559(a)(5). By recognizing that a brace-equipped pistol did not create a GCA "short-barreled rifle" or NFA "firearm," ATF encouraged more shooters to use braces for safer and more stable shooting.

Following its 2012 classification, ATF issued more than a dozen classification letters finding that various stabilizing braces attached to pistols were not short-

8

barreled rifles.  Rule, 88 Fed. Reg. at 6,502 n.84.  It took the same position in criminal prosecutions, advising federal judges that attaching a stabilizing brace to a pistol does not create a short-barreled rifle.  *See, e.g.*, App. 511; R.Doc. 1-19, at 38:9-15.  To be sure, ATF disapproved certain accessories that were not useful as a brace.  But then, in 2017, ATF reiterated that, in general, "stabilizing braces are *perfectly legal accessories* for large handguns or pistols."  *See* App. 563; R.Doc. 1-20, at 1 (emphasis added).  ATF also clarified that a brace's classification would not change "even if the attached firearm happens to be fired from the shoulder."  App. 564; R.Doc. 1-20, at 2.  This letter "created a thriving market for these stabilizing braces."  *See* App. 568; R.Doc. 1-21, at 2; *accord* Rule, 88 Fed. Reg. at 6,560 (acknowledging "demand . . . t[ook] off" in "2017").

### C.     ATF's Reversal Under The Rule.

After millions of Americans purchased stabilizing braces in reasonable reliance on ATF's prior classification decisions, ATF changed its mind.  On June 10, 2021, ATF issued a Notice of Proposed Rulemaking that attempted to reconcile ATF's previous positions by "assign[ing] point values" to "characteristics or features" that it considered probative of intent to shoulder.  *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," Notice of Proposed Rulemaking, 86 Fed. Reg. 30,826, 30,829 (June 10, 2021) ("Notice").  The Notice provided example classifications under the proposed points system, including an AR-type

9

pistol with Appellant SB Tactical's "Mini" brace attached, which ATF found would *not* qualify as a short-barreled rifle.

On January 31, 2023, ATF released the Rule. In response to comments demonstrating that the points system was unworkable, ATF rejected that system and invalidated all prior stabilizing brace classifications, adopting in their place a multi-factor test that purports to identify shoulder-fired weapons. Rule, 88 Fed. Reg. at 6,480, 6,574-75 (codified at 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11). Although this test is nominally "dependent on the specific configuration of the firearm," *id.* at 6,507, the new definition purports to encompass 99% of all stabilizing braces, App. 189; R.Doc. 1-5, at 21, including even the AR-type pistol affixed with an SB-Mini that ATF said was not a short-barreled rifle in the Notice issued 18 months earlier. According to ATF, millions of Americans have been committing felonies for years. *See* Rule, 88 Fed. Reg. at 6,560. As explained below, even that estimate significantly understates the scope of criminal liability.

ATF now claims that stabilizing braces were always and unambiguously unlawful. Even though the agency itself read the statutes differently for more than a decade, ATF contends that the Rule "does not impose any new legal obligations on owners of 'stabilizing braces' at all," and instead "merely conveys more clearly to the public" the meaning of the NFA and the GCA. Rule, Fed. Reg. at 6,478. ATF even claims to have "put the public on notice" that certain pistols might be rifles

10

with its 2017 letter, *id.* at 6,555—that is, the letter advising the public "that stabilizing braces are *perfectly legal accessories*." *See* App. 563; R.Doc. 1-20, at 1 (emphasis added).

The Rule is deeply unpopular. "Comments were overwhelmingly negative, with 217,000 of the 237,000 comments made in opposition (~92%)." *Mock*, 75 F.4th at 573 (citing Rule, 88 Fed. Reg. at 6,497).

The Rule purports to conduct two inquiries to determine whether a brace-equipped pistol is in fact a GCA "short-barreled rifle" or an NFA "firearm." First, ATF will assess whether the brace "provides surface area that allows the weapon to be fired from the shoulder." Rule, 88 Fed. Reg. at 6,575. Second, ATF will assess whether six "other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Ibid.* These six factors include (1) weight and length, (2) length of pull, (3) sights or scope, (4) whether the brace is necessary for the cycle of operations, (5) marketing materials, and (6) information from "the general community." *Ibid.*

ATF's approach departs from the Notice—so much so that the Fifth Circuit held the Rule "violates the APA" because it "fails the logical-outgrowth test." *Mock*, 75 F.4th at 578. Rather than assign points, ATF "consider[s]" whether the factors "indicate that the weapon is designed, made, and intended to be fired from the

11

shoulder." Rule, 88 Fed. Reg. at 6,497. As explained below, the precise way ATF
will make that determination without a point system is a mystery.

### D. ATF's Entrenchment Through Dozens Of Adjudications.

Along with the Rule, ATF simultaneously issued 60 adjudications classifying
common weapon platforms equipped with braces and commercially available
firearms equipped with braces ("the Adjudications"). *See* App. 265-307; R.Doc. 1-
6, at 1-43; App. 309-46; R.Doc. 1-7, at 1-38. The Adjudications contain no analysis.
Each provides only a photograph of a common weapon platform or firearm and
labels it a "short-barreled rifle." The Adjudications cover the most popular
stabilizing braces in the United States.

### E. The District Court Denies Preliminary Relief.

ATF issued the Rule on January 31, 2023. Appellants filed their complaint
and motion for preliminary injunction within days, on February 9 and 10. Seven
months later, the district court denied the motion. Although the district court agreed
that Appellants had made "some reasonable arguments in support of their position,"
it concluded that "none necessitate the issuance of a preliminary injunction at this
sta[g]e." ADD-14; App. 666; R.Doc. 90, at 14. The district court did not address
Appellants' irreparable harms nor the balance of equities.

The district court based its statutory analysis on an issue not in dispute.
According to the district court, the mere existence of ATF's "authority to interpret

the NFA and GCA where there is ambiguity" necessarily meant it was "not likely the Plaintiffs [would] succeed on th[eir] claim" that ATF had misinterpreted the term "rifle." ADD-13-14; App. 665-66; R.Doc. 90, at 13-14. But Appellants had not disputed ATF's rulemaking authority, arguing instead that ATF had misused that authority by failing to adhere to the "basic tenet that regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *Decker v. NW Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (quotations omitted). The district court did not analyze Appellants' actual argument that ATF's interpretation of "rifle" conflicts with the NFA and GCA. Nor did it even purport to address Appellants' arguments that ATF misinterprets the NFA term "firearm" and the GCA term "short-barreled rifle."

The district court also rejected lenity, finding the statutes' application to braced pistols "not unclear" nor "grievously ambiguous." ADD-15; App. 667; R.Doc. 90, at 15. The district court did not attempt to square that conclusion with its prior assertion that ATF possesses interpretive authority to resolve "ambiguity" because "Congress did not shed any additional light on the definition of rifle." ADD-13; App. 665; R.Doc. 90, at 13. Nor did the district court address the significance of ATF's own flip flops on braced pistols in determining whether grievous ambiguity exists.

Moreover, the district court barely addressed the APA arguments. The district court focused its arbitrary-and-capricious analysis on a statutory argument made by "other litigants" in a different case. ADD-17-18; App. 669-70; R.Doc. 90, at 17-18. And the district court glossed over ATF's uncontested failure to consider the costs and reliance interests associated with the more than 2.3 million braces sold from 2020 to 2023. That portion of its opinion consisted of just a block quote to an out-of-circuit district-court decision addressing a different argument about different costs asserted by a *pro se* litigant in Virginia. ADD-19; App. 671; R.Doc. 90, at 19.

Finally, the district court excused ATF's unlawful Adjudications by finding them "not final agency action." ADD-22; App. 674; R.Doc. 90, at 22. But in reaching that conclusion, the district court failed to address the express language of the Adjudications, which state that certain braced pistols "*are* short-barreled rifles" and therefore "*are* subject to the provisions of the NFA." App. 265; R.Doc. 1-6, at 1; App. 309; R.Doc. 1-7, at 1 (emphases added). The Adjudications are final and, regardless, they show the Rule is arbitrary.

### F. The Fifth Circuit Grants Preliminary Relief.

Meanwhile, the Fifth Circuit held the Rule "violates the APA" because it "fails the logical-outgrowth test." *Mock*, 75 F.4th at 578.

In explaining that decision, the Fifth Circuit endorsed several of Appellants' arguments, which they raised there as *amici*. Just like Appellants argued below, the

14

Fifth Circuit found that the Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," instead allowing ATF "to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Id.* at 584-85. Consequently, "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol." *Ibid.*

The Fifth Circuit also found particularly troubling the Rule's factors "involving analysis of third parties' actions." *Id.* at 585. These would wrongly "hold citizens criminally liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated." *Id.* at 586. And the Fifth Circuit agreed that "ATF did not provide explanations with its contemporaneous adjudications that certain weapons and platforms with stabilizing braces were [short-barreled rifles] under the Final Rule, nor did the ATF provide a single example of a stabilizing brace with a handgun that would be permitted under the Final Rule." *Id.* at 585.

In its decision, the Fifth Circuit did not decide the preliminary injunction's scope but remanded that decision "to the district court in the first instance." *Id.* at 587. The district court entered an injunction but only for the parties there. *See Mock v. Garland*, 2023 WL 6457920, at *17-*18 (N.D. Tex. Oct. 2, 2023). Since then, more district courts have enjoined the Rule. *See Britto v. ATF*, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023); *Texas v. ATF*, 2023 WL 7116844 (S.D. Tex. Oct. 27,

15

2023); *Texas Gun Rights v. ATF*, No. 4:23-cv-00578, ECF No. 36 (N.D. Tex. Oct. 4, 2023). These decisions do not eliminate the need for relief here.

## SUMMARY OF ARGUMENT

The district court erred in ruling that Appellants were unlikely to succeed on the merits. Congress enacted the NFA and GCA to discourage ownership of short-barreled rifles while leaving pistols unrestricted. The Rule purports to reach pistols because it subjugates the statutes' text, structure, history, and purpose to ATF's naked policy goals. Were that not enough, the Rule is otherwise arbitrary and capricious because it provides no useful guidance and fails to address key aspects of the issues.

Two NFA subsections address short-barreled rifles (under the NFA called "firearms" and under the GCA "short-barreled rifles"). One concerns guns originally produced as long rifles and later "modified" to make them shorter. 26 U.S.C. § 5845(a)(4). The other subsection concerns rifles that are originally produced with short barrels. *Id.* § 5845(a)(3). (The GCA adopts a substantially similar structure.) Neither NFA subsection says anything about rifles made from pistols, and the Rule's attempt to wring that result from the statutes does violence to the statutory language and to the obvious congressional design.

Besides misinterpreting "firearm" and "short-barreled rifle," the Rule misinterprets "rifle." Under both statutes, a "rifle" must be "designed" and

16

"intended" for shoulder fire. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule misinterprets "designed" by overlooking the Supreme Court's teaching that an item is "designed" for what it should be "principally used." *Hoffman*, 455 U.S. at 501. The Rule errs because it preemptively excludes features showing that the principal "useful purpose" for a brace is to stabilize non-shouldered fire. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. at 512-13 (1992) (plurality opinion). Contrary to the district court's analysis, Appellants do not suggest a gun is only a rifle if it is "exclusively fired from the shoulder," ADD-17; App. 669; R.Doc. 90, at 17; rather, as the Supreme Court held in *Village of Hoffman Estates*, a gun is a rifle only if its physical characteristics show that its *principal* use is shoulder fire.

Similarly, the Rule misinterprets "intended" because it wrongly considers unrelated parties' speech and actions (what the Rule calls "general community" "information," Rule, 88 Fed. Reg. at 6,544). Appellate courts have consistently recognized that such third-party materials are irrelevant to ascertaining first-party intent. And the Rule's misinterpretation of this statutory term to allow its *ad hoc* consideration is especially egregious because it would permit the Government to "hold citizens criminally liable for the actions of others." *Mock*, 75 F.4th at 586.

If any doubt remains about the statutes' meaning, lenity requires that the Rule be set aside. As elsewhere, "ATF's own flip flop in its position" here shows that the NFA and GCA are "subject to more than one reasonable interpretation" and thus that

17

"lenity" applies. *Hardin*, 65 F.4th at 898-902 (applying lenity to invalidate ATF's bump stock rule); *see also Thompson/Ctr*, 504 U.S. at 517-18 (applying lenity to reject ATF's interpretation of "firearm" in a "civil setting"). Because the NFA and GCA do not clearly and unambiguously regulate braced pistols, the Court must construe the statute in Appellants' favor.

Beyond violating the statutes, the Rule is arbitrary and capricious because the factors it adopts are arbitrary and capricious whether taken as a group or individually, and because ATF failed to count known costs and reliance interests. As for the factors taken together, ATF says they will "allow[ ] members of the firearm industry and the public to evaluate their weapon[s]" and understand their regulatory responsibility. Rule, 88 Fed. Reg. at 6,551. But the Fifth Circuit held otherwise, explaining that ATF's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace." *Mock*, 75 F.4th at 585.

The factors fare no better considered individually. ATF claims that factors such as "surface area," "weight," "length," and "length of pull" use "quantifiable, easily measured metrics." Rule, 88 Fed. Reg. at 6,513. But if so, the Rule declines to provide them—even though many commenters requested additional clarity and ATF "has not claimed that it is impossible to be more precise." *Tripoli Rocketry*, 437 F.3d at 81. Moreover, the Rule's facile comparisons based on "characteristics in common," *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C.

18

2014), recycles a flawed methodology, *see VanDerStok v. Garland*, 2023 WL 7403413, at \*25 (5th Cir. Nov. 9, 2023) (Oldham, J., concurring). The Rule's most subjective factors are also arbitrary because they authorize ATF to cherry-pick statements by third parties to supposedly prove a manufacturer's ill intent.

The 60 Adjudications ATF issued with its Rule likewise confirm its arbitrariness. The district court believed the Adjudications were non-final, but the Rule and ATF's own declarant say otherwise. On the merits, the Fifth Circuit recognized that the Adjudications are entirely unexplained and failed to offer a "single given example" that "would constitute an NFA-exempt braced pistol." *See Mock*, 75 F.4th at 574-75, 585. Apart from themselves violating the APA, the Adjudications show that the Rule is arbitrary.

The district court did not address the remaining preliminary-injunction factors, but Appellants established those too. The companies represented here cannot be compensated for the economic injury caused by the Rule, nor can they be recompensed for their reputational injuries. Mr. Cicero, the combat-disabled veteran who needs a stabilizing brace to shoot effectively, cannot recover the lost opportunities to exercise his constitutional rights. The States, likewise, will not be paid back for the undisputed compliance costs and harms to their law-enforcement interests. Against all this, ATF's supposed interest in enforcing its unlawful rule cannot carry the day, particularly when ATF acknowledges it has already stopped

19

some enforcement based on the injunctions already issued and when the Rule's purported public-safety benefits are undercut by the decade-long status quo. Appellants were (and are) thus entitled to a preliminary injunction, and the district court erred in holding otherwise.

## ARGUMENT

## I. STANDARD OF REVIEW

Although the decision whether to grant a preliminary injunction is reviewed only "for abuse of discretion," a decision grounded in erroneous legal principles is "considered *de novo*." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023); *see also MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1015-16 (8th Cir. 2020). "To obtain a preliminary injunction, [the moving party] must establish: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *Dakotans for Health v. Noem*, 52 F.4th 381, 388 (8th Cir. 2022) (citations and quotations omitted) (alterations accepted); *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981).

Appellate Case: 23-3230   Page: 31   Date Filed: 11/16/2023 Entry ID: 5336284

## II. THE DISTRICT COURT WRONGLY REJECTED APPELLANTS' LIKELY SUCCESS ON THE MERITS.

### A. The Rule Exceeds ATF's Statutory Authority.

#### 1. The Rule Misinterprets "Firearm" And "Short-Barreled Rifle."

The Rule violates the NFA and GCA because it wrongly subjects braced pistols to the stringent regulations that Congress reserved for short-barreled rifles. Congress enacted the NFA to regulate specific firearms favored by prohibition-era "gangster[s]"—"i.e., sawed-off shotguns, sawed-off rifles, and machine guns." United States Br. 5, *United States v. Miller*, 307 U.S. 174 (1939), 1939 WL 48353, at *5; *see Lomont v. O'Neill*, 285 F.3d 9, 11-12 (D.C. Cir. 2002). But it left pistols untouched. And when Congress enacted the GCA 30 years later to expand regulation of short-barreled rifles, that statute defined handguns but did not add any extra restrictions on them.

Two NFA subsections address short-barreled rifles, and the district court analyzed neither. Subsection 5845(a)(4) concerns the specific evil of sawed-off rifles, designating as an NFA "firearm" "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(4). Because the NFA defines "ma[d]e" to exclude production by a "qualified" manufacturer, *id.* § 5845(i), subsection (a)(4) covers only rifles shortened after initial production.

21

Subsection (a)(3) reaches initial production. It regulates "a rifle having a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3). Because subsection (a)(3) omits "made" or "modified"—terms present only in subsection (a)(4)—this provision applies to short-barreled rifles produced by a qualified manufacturer. Subsection (a)(3) thus ensures the NFA treats commercially produced short-barreled rifles the same as subsection (a)(4) treats sawed-off rifles.[1]

Neither subsection purports to regulate pistols, accessories, or stabilizing braces. Subsection (e) confirms the omission is intentional, expressly excluding "pistols" from the catch-all definition for an NFA "firearm." 26 U.S.C. § 5845(e); *see also Mock*, 75 F.4th at 570 ("the NFA specifically exempts 'a pistol or a revolver having a rifled bore' from its coverage").

The Rule imposes restraints that Congress deliberately did not. ATF says a pistol becomes an NFA short-barreled rifle when a stabilizing brace is attached. Rule, 88 Fed. Reg. at 6,480. But that cannot be correct under subsection (a)(4) because that subsection addresses only "a weapon made from a rifle." The provision says nothing about a weapon made from a pistol, and "a matter not covered is to be

---

[1] These NFA distinctions are reinforced by the GCA, which similarly defines a "short-barreled rifle" as both "a rifle having one or more barrels less than sixteen inches in length" and as "any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8).

22

treated as not covered." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020).

Nor can the Rule's interpretation be correct under subsection (a)(3). Only subsection (a)(4) says "modified." And only subsection (a)(4) says "made"—a term that expressly excludes "one qualified to engage in such business," 26 U.S.C. § 5845(i), and thus also refers only to modification. Subsection (a)(3), by contrast, omits both the term "made" and the term "modified." As these "differences in language" must convey "differences in meaning," *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017), Congress's choice to omit "made" and "modified" from subsection (a)(3) must mean that the subsection does not address post-production additions of an accessory. Rather, subsection (a)(3) covers only short-barreled rifles that are originally manufactured as such. *Cf. United States v. Fix*, 4 F. App'x 324, 326 (9th Cir. 2001) (holding 26 U.S.C. § 5845(e) "does not consider modifications of the weapon by the owner").

The Rule's failure to acknowledge the differences in language presents another related problem. If ATF were correct that subsection (a)(3) regulates a weapon "made" or "modified" from a pistol or rifle even though that subsection omits these terms, subsection (a)(4) would be left with no work to perform, its role subsumed by subsection (a)(3). And because this interpretation would "violate the cardinal rule" that "effect shall be given to every clause and part of a statute,"

Appellate Case: 23-3230     Page: 34     Date Filed: 11/16/2023 Entry ID: 5336284

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up), it must be rejected, *see Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (rejecting interpretation that collapsed two statutory provisions).

The Rule also rejects Congress's "obvious purpose." *Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Iowa N. Ry. Co.*, 37 F.4th 1399, 1409 (8th Cir. 2022); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("Language takes meaning from its … historical and governmental contexts." (citation omitted)). Congress believed that shortening a long gun "fosters its use in illicit activity" because it is more easily "concealed." *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010); *accord* Rule, 88 Fed. Reg. at 6,499. But the same is not true when a stabilizing brace is attached to a pistol because the gun becomes larger and thus harder to conceal. Unlike a sawed-off rifle, which becomes *more* suitable for committing crimes than an unmodified rifle, a braced pistol becomes *less* suitable for committing crimes than an unmodified pistol.

In addition to being less concealable, a braced pistol is more accurate. Rule, 88 Fed. Reg. at 6,557; *accord* Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 ("pistols modified with stabilizing braces" are "a hell of a lot more accurate"). ATF views accuracy as more dangerous. But the NFA's authors believed otherwise because a "sawed-off" weapon's "somewhat indiscriminate accuracy" made it "useful for only violence against another person."

24

*Marzzarella*, 614 F.3d at 95 (citation omitted). The reverse is true of a braced pistol. "Rearward attachments, besides making a pistol less concealable, improve a pistol's stability, and thus a user's accuracy." *Mock*, 75 F.4th at 588 (Willett, J., concurring). "Accuracy, in turn, promotes safety." *Ibid.* ATF's decision to regulate lengthened short guns is the opposite of Congress's decision to regulate shortened long guns.

### 2. The Rule Misinterprets "Designed" and "Intended."

Under the NFA and GCA, a "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule purports to clarify when a weapon is "designed" and "intended" for shoulder fire, but it commits fundamental errors with each term. Appellants raised these issues below, but the district court failed to engage them.

#### a. Designed

The Rule misinterprets "designed" because it declines to consider evidence that a brace is designed to facilitate stabilizing support. In ATF's estimation, "stabilizing support" for non-shoulder firing is "not relevant to determine whether a firearm is designed, made, and intended to be fired from the shoulder." Rule, 88 Fed. Reg. at 6,510; *see also id.* at 6,503 (asserting it is "incorrect to focus on whether a 'Stabilizing brace' can be used, in some circumstances, to support two-handed, non-shouldered fire.").

25

ATF is wrong.  In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the Supreme Court interpreted a statute prohibiting sale of items "designed . . . for use with illegal cannabis or drugs."  *Id.* at 491.  The Court found it "plain" and "clear" that "designed" includes "an item that is principally used with illegal drugs" but not "items which are principally used for nondrug purposes."  *Id.* at 501.  Thus, the statute would cover a pipe "typically used to smoke marihuana" but not "ordinary pipes"; a "roach clip" but not "paper clips sold next to *Rolling Stone* magazine."  *Id.* at 494, 501-02.

The Supreme Court has applied similar reasoning under the NFA.  In *Thompson/Center Arms*, the plurality explained that someone did not "make" a "firearm" by packaging components that could "be converted not only into a short-barreled rifle, which is a regulated firearm, but also into a long-barreled rifle, which is not."  504 U.S. at 513.  Because the "aggregation of parts" served a "useful purpose" other than "the assembly of a[n NFA] firearm," lenity required the conclusion that the parts had "not been 'made' into a short-barreled rifle for purposes of the NFA."  *Id.* at 512-13, 517-18.

Applied here, both *Hoffman Estates* and *Thompson/Center Arms* stand for the same principle: ATF cannot read the term "designed" to exclude all evidence that a stabilizing brace is suitable for unregulated use as a brace.  Just like Illinois could not overlook that a paperclip is "designed" for holding documents, ATF cannot

26

criminalize braces by ignoring evidence they are "designed" for non-shouldered use. And just like ATF could not in *Thompson* overlook that the packaged parts could be assembled for an unregulated use, ATF cannot here willfully overlook evidence of design features that show a stabilizing brace likewise has an unregulated use.

ATF agreed in its 2021 Notice that "[s]tabilizing support is a vital characteristic because it provides evidence to evaluate the purported purpose of the attached device." Notice, 86 Fed. Reg. at 30,832. That interpretation was consistent with a decade of ATF rulings that assessed design by analyzing a device's effectiveness at "provid[ing] the shooter with additional support of a firearm." App. 458; R.Doc. 1-15, at 1 (2012 classification letter). For example, ATF found probative "flaps" and a "strap" that "wrap[] around the shooter's forearm" because such "designs were clearly devised to secure the firearm to the shooter's forearm and were effective in doing so." Notice, 86 Fed. Reg. at 30,832; *accord* U.S. Patent No. 8,869,444 B2 (explaining intended design).

The absurd results that ATF's new interpretation would produce confirm it is wrong. Under the Rule, ATF will not even consider evidence that a stabilizing brace is effective at non-shoulder firing. Thus, if the objective design features established that an accessory was "the world's greatest" stabilizing brace—"100% effective at" stabilizing non-shoulder fire—ATF would ignore that evidence. *See Innovator Enterprises*, 28 F. Supp. 3d at 25 (rejecting similar ATF test for classifying

27

silencers). But that effectiveness is plainly "relevant." *Contra* Rule, 88 Fed. Reg. at 6,510. If a brace serves a "useful purpose," as an unshouldered brace, *Thompson/Ctr.*, 504 U.S. at 512-13, it suggests that the potential for shouldered fire is "incidental," *id.* at 6,544, rather than a capability "designed by the manufacturer," *Hoffman*, 455 U.S. at 501.

As part of its arbitrary-and-capricious analysis, the district court said that the definition of a "rifle" is not "limited to devices that are designed to be exclusively fired from the shoulder." ADD-17; App. 669; R.Doc. 90, at 17. But that is beside the point. As *Hoffman* and *Thompson/Center* teach, the right question here is not whether a gun is "exclusively" fired from the shoulder (as the district court wrongly believed). Rather, the right question is whether, based on its objective design features, a gun should "principally" be fired from the shoulder. By preemptively refusing to consider all evidence that a braced pistol is principally for unshouldered use, ATF misinterprets "designed."

### b. Intended

The Rule also misinterprets "intended." The Rule requires ATF to determine a manufacturer's intent based on "marketing materials" produced by third parties, as well as other third-party "information demonstrating the likely use of the weapon by the general community." Rule, 88 Fed. Reg. at 6,544. This *ad hoc* "analysis of third parties' actions," the Fifth Circuit explained, will wrongly "hold citizens criminally

liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated." *Mock*, 75 F.4th at 586. That interpretation violates the statute because third-party intent is irrelevant to a manufacturer's intent.

The courts of appeals agree. In *Record Head Corp. v. Sachen*, 682 F.2d 672 (7th Cir. 1982), the Seventh Circuit interpreted a drug paraphernalia ordinance that, like the Rule, enumerated factors that supposedly would enable law enforcement to determine whether items for sale were "designed" and "intended" for unlawful use. *Id.* at 677. Invalidating the ordinance as unconstitutionally vague, the Seventh Circuit explained that factors requiring law enforcement to examine third-party "advertising" and "opinion" had no "conceivable relevance to the intent of the seller" and thus compounded the constitutional problem. *Ibid.*; *see also, e.g.*, *United States v. Biro*, 143 F.3d 1421, 1428 (11th Cir. 1998) ("the customer's intended use" is irrelevant to "design"); *Tobacco Accessories & Novelty Craftsmen Merchs. Ass'n of Louisiana v. Treen*, 681 F.2d 378, 385 (5th Cir. 1982) ("We are persuaded that the 'designed for use' language of the Louisiana Act similarly applies only to manufacturers, for their own acts of design."). Because ATF's reading of the statute rests on a flawed understanding of "intended," the Rule is invalid.

29

### 3. The Rule Violates Lenity.

At a minimum, lenity requires that the Rule be set aside. "The rule of lenity states that ambiguities in criminal statutes should be resolved in favor of the defendant." *United States v. Buford*, 54 F.4th 1066, 1068 (8th Cir. 2022). Because the NFA and GCA authorize criminal penalties, lenity applies even "in a civil setting." *Thompson/Ctr*, 504 U.S. at 517-18 (plurality); *id.* at 519 (Scalia, J., concurring); *accord Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). Here, the NFA's and GCA's text, structure, history, and purpose unambiguously foreclose their application to braced pistols. But if the Court disagrees, then the statutes are at least grievously ambiguous as applied to braces.

The Rule's preamble explains why. When ATF first considered the stabilizing braces at issue, it understood that their attachment to a pistol "d[oes] 'not convert that weapon to be fired from the shoulder'" and thus that "such a firearm *would not* be subject to NFA controls." Rule, 88 Fed. Reg. at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012) (emphasis in original letter)). ATF maintained this position for over a decade, issuing many interpretation letters reiterating it to the public. *Id.* at 6,502 n.84; *see also* App. 568; R.Doc. 1-21, at 2. The Department also "asserted in criminal prosecutions that 'ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA.'" *Mock*, 75 F.4th at 572; *accord* App. 511;

30

R.Doc. 1-19 at 38:9-15. Even the Notice agreed, attempting to reconcile past decisions through a points system. Notice, 86 Fed. Reg. at 30,829-32.

Then ATF reversed course. Apparently "realizing" for the first time that pistols with stabilizing braces have always and unambiguously been covered by the NFA, ATF through the Rule decided to effectively render all brace-equipped pistols short-barreled rifles. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). For ATF to upend its longstanding position shows at the very least that the NFA is grievously ambiguous as to whether it covers brace-equipped pistols.

Recent decisions from the Fifth and Sixth Circuits confirm lenity is appropriate here. In *Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023), the Sixth Circuit held unlawful an ATF rule banning "bump stocks" where, as here, ATF had allowed them "[f]or over a decade." *Id.* at 897. "ATF's own flip-flop in its position," the court explained, showed that the statute was "subject to more than one reasonable interpretation." *Id.* at 898. Applying lenity, the Sixth Circuit was "bound to construe the statute in [the challenger]'s favor." *Id.* at 902. Similarly, in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *cert. granted*, No. 22-976 (U.S. Nov. 3, 2023), the *en banc* Fifth Circuit applied lenity to invalidate a rule purporting to interpret the NFA where ATF had "construed the same statute in two, inconsistent ways at different points in time." *Id.* at 469-71.

31

Just like in *Hardin* and *Cargill*, ATF is reversing its long-held position on a particular firearms accessory. "The law hasn't changed, only [the] agency's interpretation of it." *Guedes v. ATF*, 140 S. Ct. 789, 790 (2020) (statement of Gorsuch, J.). And here, just like in those cases, ATF's reversal subjects to criminal penalties any individuals who obeyed ATF's previous rulings. If ATF believed for years that brace-equipped pistols are not subject to NFA or GCA controls, then it must be, at minimum, grievously ambiguous whether the statutes apply to braces. Lenity thus demands that the Rule be set aside.

The district court rejected lenity because it found the definition of "rifle" "not unclear." ADD-14-16; App. 666-68; R.Doc. 90, at 14-16. But elsewhere in its opinion the district court held otherwise, finding Congress had used only "ambigu[ous]" terms that "did not shed any additional light on the definition of rifle." ADD-13; App. 665; R.Doc. 90, at 13. And the district court never tried to square its lenity analysis with ATF's interpretive flip-flop. This analysis is plainly in error. At a minimum, the statute is grievously ambiguous as applied to braces and the Rule must be set aside.

### 4. The Rule Raises Serious Constitutional Doubts.

Constitutional avoidance leads to the same result. Stabilizing braces are in "common use," *see New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128, 2143 (2022), as ATF's own data show. Rule, 88 Fed. Reg. at 6,560. The

32

Second Amendment protects pistols. *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008). And because "making common, safety-improving modifications to otherwise lawfully bearable arms" is "protected Second Amendment 'conduct,'" *Mock*, 75 F.4th at 588 (Willett, J., concurring), interpreting the NFA and GCA to impose onerous burdens on braced pistols would raise serious constitutional questions. This Court should reject ATF's reading that would "push[] these" constitutional "limits." *Union Pac. R.R. Co. v. DHS*, 738 F.3d 885, 893 (8th Cir. 2013); *accord Mock*, 2023 WL 6457920, at *9-*12 (holding Rule would impair gun owners' Second Amendment rights).

### B. The Rule Adopts Otherwise Unlawful Factors.

In the court below, Appellants also showed that they are likely to succeed on the merits because the factors adopted under the Rule are arbitrary and capricious whether taken individually or as group. ATF also arbitrarily and capriciously failed to consider costs and reliance interests. The district court purported to reject all of these arguments but addressed none, apparently confusing them with different arguments made by different plaintiffs in different cases. ADD-17-19; App. 669-71; R.Doc. 90, at 17-19. The district court erred, and this Court should reverse.

#### 1. *The Factors Are Holistically Arbitrary.*

ATF's factors are arbitrary and capricious when considered together. The Rule requires ATF to "consider" surface area and six other factors to determine

33

"whether the weapon is designed, made, and intended to be fired from the shoulder."
Rule, 88 Fed. Reg. at 6,575.  But ATF does not say how it considers those factors,
reserving the prerogative to make a judgment based on "th'ol' 'totality of the
circumstances' test"—that is, the test "most feared by [regulated parties] who want
to know what to expect."  *United States v. Mead Corp.*, 533 U.S. 218, 241 (2001)
(Scalia, J., dissenting).  Worse, in a dramatic understatement, ATF admits that it will
use its self-conferred discretion to ensure that "a majority of the existing firearms
equipped with a 'stabilizing brace'" face NFA regulations.  Rule, 88 Fed. Reg. at
6,480.

The Rule is arbitrary and capricious because it is infinitely malleable.  When
an agency intends to apply "a multi-factor test through case-by-case adjudication,"
some explanation is required to provide "predictability and intelligibility" to
regulated parties.  *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004)
(Roberts, J.); *see U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 753-54
(D.C. Cir. 2015).  Otherwise, those seeking to conform their conduct to the
regulation cannot know "which factors are significant and which less so, and why."
*LeMoyne-Owen Coll.*, 357 F.3d at 61.  Those guardrails are particularly important
in this context, where "[f]ailure to comply" with the Rule "carries the potential for
ten years' imprisonment," "fines," and "a lifetime ban on ownership of firearms."
*Mock*, 75, F.4th at 570-71.

34

But here, the Rule's "factors, which are both general and unweighted, invite inquiry into areas of doubtful relevance rather than make the [regulated] conduct any clearer." *Rec. Head Corp.*, 682 F.2d at 677. ATF says its factors "objective[ly]" assess certain "design features common to rifles." Rule, 88 Fed. Reg. at 6,513; *see id.* at 6,478 ("this rule merely conveys more clearly to the public the objective design features"). Throughout the preamble, however, ATF undermines that description by stating that its articulated factors "are not themselves determinative," *id.* at 6,518, that ATF "may" elect not to use them in some cases, *id.* at 6,512, 6,531, 6,537, and that its determinations are made "on a case-by-case basis," *id.* at 6,495. In other words, classification as a short-barreled rifle is ultimately based on unbounded agency discretion.

The Fifth Circuit recognized this deficiency clearly. As that court explained, "the six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace." *Mock*, 75 F.4th at 585. It is instead "nigh impossible for a regular citizen to determine what constitutes a braced pistol," such that "an owner may not be on notice that his firearm is subject to criminal penalties without registration." *Ibid.* The Fifth Circuit thus rejected "ATF's bald assertion" that the Rule provides "clear guidance"—noting that ATF provided "no examples of any designs" that are "not subject to the NFA." *Ibid.* (quotations omitted).

35

ATF's more-than 60 contemporaneous Adjudications confirm the error. The Adjudications find that 100% of examined items are "short-barreled rifles" under the Rule. *See generally* App. 265-307; R.Doc. 1-6; App. 309-46; R.Doc. 1-7. The Adjudications consist solely of pictures, and no "explanations are included for how the ATF came to its conclusion as to each weapon and platform." *Mock*, 75 F.4th at 574-75, 585. If ATF can reach whatever result it wants for any gun—feeling no need to even explain itself—then its "totality of the circumstances" test is "simply a cloak for agency whim." *LeMoyne-Owen Coll.*, 357 F.3d at 61. And that whim is apparently to reach the Administration's preordained political outcome—subjecting 99% of all braced pistols to heightened regulation, App. 189; R.Doc. 1-5, at 21.

The Court should not condone ATF's "vague, indeterminate, multi-factor balancing test," which will use "uncertainty" as "a Sword of Damocles hanging over the heads of American gun owners." *VanDerStok v. Garland*, 2023 WL 7403413, at *12 (5th Cir. Nov. 9, 2023) (Oldham, J., concurring). That is not reasoned decisionmaking, but an invitation for regulatory abuse. *See Kearney Reg'l Med. Ctr., LLC v. HHS*, 934 F.3d 812, 816 (8th Cir. 2019) (explaining that agency action is arbitrary where one cannot "discern what legal standard the agency applied").

The Rule's standardless nature also reveals fundamental failures of explanation. Given that misapplying the Rule carries severe criminal consequences, ATF recognized the need for "clear and unambiguous objective design features that

36

can be readily assessed." Rule, 88 Fed. Reg. at 6,513. It thus purported to "allow members of the firearm industry and the public to evaluate whether a weapon incorporating a 'stabilizing brace' or other rearward attachment is, in fact, a short-barreled rifle subject to the NFA." *Id.* at 6,551. The resulting test that "provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *Mock*, 75 F.4th at 585, betrays a "clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). By announcing a readily assessable test and then failing to offer any meaningful clarity, the Rule is also "internally inconsistent," thereby "rendering its decision arbitrary and capricious." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1056-57 (D.C. Cir. 2022).

The Court should set aside the Rule because its factors, taken together, are arbitrary and capricious.

### 2. The Factors Are Individually Arbitrary.

The factors are also arbitrary and capricious when considered individually.

#### a. Rear Surface Area

The Rule establishes that the term "rifle" "shall include a weapon that is equipped with an accessory, component, or other rearward attachment . . . that provides surface area that allows the weapon to be fired from the shoulder." Rule, 88 Fed. Reg. at 6,575. Commenters asked the agency to clarify the amount of surface

area it deems sufficient. *Id.* at 6,521-22. But ATF rejected those pleas. *Id.* at 6,529. ATF acted arbitrarily and capriciously by failing to include a more specific surface-area criterion for three reasons.

*First*, ATF failed to explain why it could not offer a more precise factor. In *Tripoli Rocketry Association v. ATF*, 437 F.3d 75 (D.C. Cir. 2006), the D.C. Circuit held unlawful ATF's determination that hobby rocket fuel "deflagrates" because "the agency [had] never define[d] a range of velocities within which materials will be considered to deflagrate." *Id.* at 81. "[A]s a reviewing court," the D.C. Circuit explained, "we require *some* metric for classifying materials not specifically enumerated in the statute, especially when, as here, the agency has not claimed that it is impossible to be more precise in revealing the basis upon which it has made a scientific determination." *Ibid.*; *see Kearney*, 934 F.3d at 815-17 (finding action arbitrary and capricious where agency "failed to explain how it defined the relevant" standard).

The flaw the D.C. Circuit identified there is evident in the Rule, too. The preamble states, "ATF will not attempt to precisely measure or quantify the surface area or make the determination based on the existence of any minimum surface area," Rule, 88 Fed. Reg. at 6,529, but it does not say why it will not do so or claim that it would be impossible to provide "a concrete standard," *Tripoli Rocketry*, 437 F.3d at 77; *cf. United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006) (holding NFA

38

regulation of short-barreled shotgun not unconstitutionally vague because the statute "*supplies the specific measurements that will bring a shotgun within the proscribed zone*") (emphasis added). Therefore, the surface-area prerequisite is arbitrary.

*Second*, ATF's refusal to provide a metric contradicts the reasons the agency gave for abandoning its original proposal. According to the preamble, ATF abandoned its Worksheet 4999 proposal from the Notice because it was "open to subjective interpretation and application" and "did not provide a particular metric to quantify the rear surface area." Rule, 88 Fed. Reg. at 6,522. It chose to instead proceed with "objective design features" that are "readily ascertainable." *Id.* at 6,552. But ATF's new test—enough surface area to "allow" shouldering—is still "open to subjective interpretation and application" and lacks a "metric." Thus, "[b]ecause [ATF's] decision is internally inconsistent, it is arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018); *see also Constellation Mystic Power*, 45 F.4th at 1056-57.

*Third*, in adopting the surface-area factor, ATF revealed that it failed to consider both an important aspect of the problem and a reasonable alternative. The record shows that commenters raised significant and unrebutted concerns that the agency's proposed surface-area criterion lacked "information regarding" how to apply the factor, was "subjective," and "would not assist the public or industry to determine if a firearm" is covered. Rule, 88 Fed. Reg. at 6521-22. These

39

commenters explained that the problem stemmed from "no metric for quantifying the surface area" and thus requested "specific metrics." *Ibid.* ATF summarily asserted—without any explanation and despite having said the opposite elsewhere—that it was not "appropriate or necessary to specify" a metric. *Id.* at 6,529. "That falls well short of what is needed to demonstrate the agency grappled with an important aspect of the problem before it or considered another reasonable path forward." *Spirit Airlines, Inc. v. FAA*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

This factor is arbitrary.

### b. Weight, Length, and Length of Pull.

The Rule requires ATF to assess whether a weapon has a weight, length, or length of pull[2] "consistent with the weight or length of similarly designed rifles." Rule, 88 Fed. Reg. at 6,575. According to ATF, these factors "are quantifiable, easily measured metrics." *Id.* at 6,513 ("quantifiable and easily assessed"). As with rear surface area, however, the Rule fails to provide a metric that satisfies these factors or to otherwise meaningfully "articulate[ ] the standards that [will] guide[ ] [ATF's] analysis." *Tripoli Rocketry*, 437 F.3d at 81.

---

[2] "Length of pull" refers to the length "from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment." Rule, 88 Fed. Reg. at 6,575.

Consider the preamble. ATF says that these factors will assess whether a braced pistol's weight, length, and length of pull are "consistent with" the metrics of "similarly designed rifles." Rule, 88 Fed. Reg. at 6,575. But ATF's list of comparator rifles is its non-public database of "more than 12,000 firearms." *Id.* at 6,514 n.103. Although the preamble includes a table that purports to provide "example" weights, lengths, and lengths of pull from the database, *id.* at 6,514-18, 6,535-37, these are not helpful because they are underinclusive by thousands of guns and encompass broad ranges from 2 pounds to 10 pounds (weight), 18-1/2 inches to 38-1/2 inches (length), *id.* at 6,514-19, and 11 inches to 19-1/2 inches (length of pull), *id.* at 6,535-37.

ATF confirms the Rule's unworkability in its discussion of how it will select comparators. ATF considers relevant only "similarly designed rifles." *Id.* at 6,575; *see also id.* at 6,518 & n.104 (asserting ATF will compare braced pistols to rifle "variant," defined as a "similar" rifle). But that begs the question of what rifle is "similar" enough to trigger comparison. Indeed, the Rule offers zero guidance on what features it will even consider to determine whether a rifle is "similarly designed." Further, ATF does not suggest that a pistol will be compared to one "similar" rifle, but an entire subset, e.g., "AK-type pistols." *Id.* at 6,518. ATF also does not say how it will determine the comparator weight, length, or length of pull from the rifles in this subset. Is it the average? The median? The heaviest? The

41

lightest? The Rule leaves the public "as well as other regulated parties, and reviewing courts[,] guessing." *Innovator Enterprises*, 28 F. Supp. 3d at 25.

And it is not just the comparator. Even if a gun owner can determine the relevant weight(s), length(s), and length(s) of pull from the 12,000 rifles in ATF's non-public database, he then must determine whether his braced gun is "consistent with" that baseline. Rule, 88 Fed. Reg. at 6,575. But again, the Rule offers no guidance on how to conduct that inquiry. How different must the metrics be to avoid being "consistent with" the comparator? Does it matter if the braced pistol is lighter (rather than heavier) or shorter (rather than longer) than the comparator? Again, there are no answers.

Thus, as with the surface-area factor, ATF fails to offer a reason its weight, length, and length-of-pull factors cannot be more precise. Worse still, these factors are patently inconsistent with ATF's claims of "readily ascertainable" criteria, and ATF failed to consider or explain why it rejected the alternative of providing more workable "minimum or maximum weight," length, and length-of-pull criteria, Rule 88 Fed. Reg. at 6,521. Further, ATF's "consistent with" test imposes the same "unbounded relational definition" that the D.C. Circuit found to "not suffice" in *Tripoli Rocketry*. 437 F.3d at 81.

Finally, ATF fails to explain why having a similar weight, length, or length of pull to a rifle facilitates shouldering. And simply having "characteristics in common

42

with some category may not be very helpful in determining whether the object in question belongs in that category." *Innovator Enterprises*, 28 F. Supp. 3d at 25-26 ("Bud Light is not 'Single-Malt Scotch,' just because it is frequently served in a glass container, contains alcohol, and is available for purchase at a tavern."); *see also VanDerStok*, 2023 WL 7403413, at *25 (Oldham, J., concurring) ("One could make a cake that looks like a hamburger . . . . But that does not make the former taste like a Big Mac.").

The record confirms that ATF employed an arbitrary methodology by merely identifying superficial similarities between braced pistols and rifles without explaining why the similarities facilitate shouldering. In the Notice, ATF explained that "AR-type pistol[s]" weigh "approximately 5 to 7 pounds" and that a "traditional unloaded 1911-type pistol" weighs "just over 2 pounds." Notice, 86 Fed. Reg. at 30,831. Thus, guns that ATF concedes are not designed and intended for shouldering encompass nearly all of the example weight range asserted by the Rule (2 pounds to 10 pounds), confirming that a facile comparison of "weight" does not distinguish design and intent for shoulder-firing. The same is true of length of pull too, where ATF's example range is 11 inches to 19-1/2 inches, Rule, 88 Fed. Reg. at 6,535-37, and record evidence from a certified firearms instructor establishes that brace-equipped weapons with such lengths of pull are commonly fired without shouldering. *See* App. 417-23, R.Doc. 1-9, Figs. 1-7; *see also* App. 455-56, R.Doc.

43

1-14, at 6-7 (showing that a length of pull greater than 10.5 inches is not indicative of shouldering in report by certified prosthetist/orthotist).

These factors are arbitrary.

c. Marketing and Community Information

The Rule permits ATF to assess "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community." Rule, 88 Fed. Reg. at 6,575. But the Rule does not explain how ATF will assess this information, permitting the agency to reach arbitrary and capricious results.

Once again, the preamble illustrates the problem. Since its inception, Appellant SB Tactical has published countless training and marketing materials instructing users how to properly use its stabilizing braces. SB Tactical has *never* said that its braces should be used for shouldering. Despite that, ATF faults SB Tactical for a website banner displayed from 2017 to 2019 reading, "Stiff Arm the Establishment." Rule, 88 Fed. Reg. at 6,544-45. A "stiff arm" refers to "the one-handed precision stance" that ATF concedes it had deemed NFA-compliant before its recent reversals. *Id.* at 6,479. And if ATF cited an old SB Tactical slogan because it disliked the anti-establishment message, it goes without saying it is protected speech. *See Cohen v. California*, 403 U.S. 15, 25 (1971). The heavy weight ATF

44

appears to place on a single, cherry-picked web banner displayed years ago shows that this factor is arbitrary and capricious.

Equally arbitrary is the agency's factor purporting to analyze information "in the general community." Rule, 88 Fed. Reg. at 6,575. Elsewhere, ATF contends "the method in which a 'stabilizing brace' may be used, in isolated circumstances or by a single individual," is not "relevant to examining whether a firearm is designed, made, and intended to be fired from the shoulder." *Id.* at 6,519. But under this factor, ATF tries to eat its cake too; it depicts in the preamble two individuals who appear to be misusing a stabilizing brace and cites these isolated examples as supposed evidence of "community information." *Id.* at 6,546. This "internal[ ] inconsisten[cy]"—which permits ATF to discount evidence establishing the brace's proper use as mere anecdote but then to count isolated evidence of improper use as community information—is "arbitrary and capricious." *ANR Storage Co.*, 904 F.3d at 1028.

Furthermore, ATF ignores record evidence that thousands of wounded warriors and other individuals have been trained or retrained to shoot by properly using a stabilizing brace. *See, e.g.*, App. 359-60, R.Doc. 1-8, at 10-11; App. 413, R.Doc. 1-9, at 1; App. 450, R.Doc. 1-14, at 1. Many of these individuals cannot fire a gun in any other way. Surely, these examples are relevant as "community information." ATF's decision to simply ignore this record evidence while

45

purporting to consider a weapon's "likely use in the general community" is further evidence that this factor is arbitrary and capricious.

### 3. *ATF's Failure To Consider Costs And Reliance Interests Is Arbitrary.*

ATF concedes it was required to consider costs, Rule, 88 Fed. Reg. at 6,571-74, consistent with the statutory requirements to determine whether the Rule was "needful" and "necessary." 26 U.S.C. § 7805(a); 18 U.S.C. § 926(a)); *see Michigan v. EPA*, 576 U.S. 743, 752 (2015). A deficient cost-benefit analysis renders a rule arbitrary and capricious. *See Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 203-06 (D.C. Cir. 2007).

To reasonably assess costs, ATF "must consider them all." *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1010-11 (8th Cir. 2018) (citations and quotations omitted). But here, ATF inexplicably failed to consider all costs associated with stabilizing braces sold in 2020, 2021, and 2022. *See* App. 186; R.Doc. 1-5, at 18. That omission is striking because ATF acknowledges these are three of the six highest-production years, Rule, 88 Fed. Reg. at 6,560 (reporting brace production "t[ook] off" in 2017), and commenters told ATF its estimate was too low, *see, e.g.*, App. 403, R.Doc. 1-8, at 54. Appellant SB Tactical alone sold more than *2.3 million braces* from 2020 until ATF published the Rule. *See* App. 427; R.Doc. 1-10, ¶ 15. Against ATF's assumption that there are approximately

46

three-million braces in circulation, Rule, 88 Fed. Reg. at 6,560, this oversight is significant.

Failing to consider the millions of affected individuals who purchased stabilizing braces since 2020 also caused ATF to overlook these Americans' reliance interests. "When an agency changes course, as [ATF] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Such interests are particularly acute here because "law-abiding Americans (and the law-abiding gun companies that serve them) rely on longstanding regulatory certainty to avoid falling afoul of federal gun laws." *VanDerStok*, 2023 WL 7403413, at *12 (Oldhamn, J., concurring). Thus, the Rule is independently "arbitrary and capricious in violation of the APA" because ATF failed to consider the reliance interests of millions of law-abiding citizens. *Regents*, 140 S. Ct. at 1913-15.

The district court erred in finding otherwise. Addressing instead an argument made by a *pro se* litigant in a different case, the district court found ATF's analysis "reasonable" because "ATF calculated the anticipated cost of the Final Rule by doubling its initial estimate of pistols outfitted with stabilizing braces," ADD-19; App. 671; R.Doc. 90, at 19, providing a "high-end" estimate of "7 million," App. 186; R.Doc. 1-5, at 18. But that estimate is still one end of a range estimating braces

sold "*between the years 2013 and 2020*." App. 186; R.Doc. 1-5, at 18 (emphasis added). That ATF used a range does not cure ATF's failure to consider all costs and reliance interests stemming from three years of brace sales in estimating that range.

### C. The Adjudications Are Unlawful And Confirm The Rule Is Arbitrary.

#### *1. The Adjudications Are Reviewable.*

ATF issued 60 contemporaneous Adjudications with its Rule that classify as short-barreled rifles pistols equipped with the most popular stabilizing braces in the country. *See generally* App. 265-307; R.Doc. 1-6; App. 309-46; R.Doc. 1-7. The district court held the Adjudications were "not final agency action," ADD-22; App. 674; R.Doc. 90, at 22, but it is wrong.

The Adjudications unambiguously state that specific braced pistols "*are* short-barreled rifles" and therefore "*are* subject to the provisions of the NFA." App. 265; R.Doc. 1-6, at 1; App. 309; R.Doc. 1-7, at 1 (emphases added). ATF's declarant likewise affirms the Adjudications "determined that each such firearm was a short-barreled rifle." App. 644; R.Doc. 63-1, ¶ 8. Because the Adjudications have "committed" ATF to its position, *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 969 (8th Cir. 2016), they "mark the consummation" of ATF's decisionmaking process, *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

48

The Adjudications also "ha[ve] direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178; *see also Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1002 (8th Cir. 2015), *aff'd*, 578 U.S. 590 (2016). The Rule explains that the Adjudications identify braced pistols "that are short-barreled rifles." Rule, 88 Fed. Reg. at 6,514. It then says: "For such weapons, action such as registration in the [National Firearms Registration and Transfer Record] *will need to be taken* as discussed in section V.B of this preamble," *ibid.* (emphasis added); *see also* section V.B (setting requirements for "[p]ersons in possession of short-barreled rifles equipped with a 'stabilizing brace' device"). Because the Adjudications are final decisions that require gun owners and other individuals to take specific actions or face criminal penalties, they are "final agency action" subject to judicial review. *Bennett*, 520 U.S. at 178.

The district court held otherwise because it believed the Adjudications "representative of how ATF will apply" its Rule going forward. ADD-22; App. 674; R.Doc. 90, at 22. But that does not change that the Adjudications are unquestionably dispositive of ATF's position as to the depicted configurations, and therefore are "final" as to those configurations. That the Adjudications may also have "representative" value as to other possible configurations, if anything, only underscores that they are final. After all, "[t]entative opinions are not relied on as

49

precedent." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980).

### 2. *The Adjudications Are Not Reasonably Explained.*

The Adjudications fail to satisfy the APA's "requirement that [ATF] provide a reasoned explanation for its action." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916. For each of the 60 Adjudications, ATF simply presents a picture of a brace-affixed pistol and then labels it a short-barreled rifle. As the Fifth Circuit recognized, "No explanations are included for how the ATF came to its conclusion[s]." *Mock*, 75 F.4th at 574-75; *see also id.* at 585 ("The ATF did not provide explanations with its contemporaneous adjudications"). Under the APA, "conclusory statements" by an agency "do not suffice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). Because ATF has not offered "reasons that can be scrutinized by courts and the interested public," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019), the Adjudications are arbitrary.

### 3. *The Adjudications Confirm That The Rule Is Arbitrary.*

Regardless of whether they are final agency action, the Adjudications show how ATF plans to apply the Rule and thus confirm a fundamental problem with the Rule: the agency's "factoring criteria" are merely window dressing that allow ATF to reach whatever result it wants.

The Adjudications' treatment of the "SB-Mini" (also called the "SBL-Mini") demonstrates this clearly. Before the Rule, ATF issued a preliminary decision opining that a pistol affixed with the SB-Mini stabilizing brace is *not* a short-barreled rifle. Rule, 88 Fed. Reg. at 6,492 (citing preliminary classification letter issued in 2020). And in the Notice, the SB-Mini again passed muster as a braced handgun, not a short-barreled rifle. Notice, 86 Fed. Reg. at 30,834-37. But when ATF issued the Adjudications, it took the opposite position and purported to classify an "AR-type" pistol with an SB-Mini attached as a "Short-barreled Rifle." App. 272; R.Doc. 1-6, at 8. The Adjudications offer no analysis and no explanation for this change. Indeed, as the Fifth Circuit explained, "it is wholly unclear why the AR-type firearm with an SB-Mini accessory, adjudicated as an approved braced handgun in the [Notice], is not adjudicated the same way under the Final Rule." *Mock*, 75 F.4th at 585 (citation omitted).

If the Rule is so nebulous that ATF can come to a classification decision that contradicts two prior analyses—without so much as a sentence of explanation—then the Rule plainly "does not adequately explain the standard on which [ATF's] decision[s]" will be "based." *Kearney*, 934 F.3d at 816. The Rule instead allows ATF to reach its predetermined outcome of outlawing 99% of all braces in circulation, App. 189; R.Doc. 1-5, at 21, on the apparent bet that "law-abiding Americans will abandon [their braces] rather than risk the ruinous felony

51

prosecutions that come with violating the new, nebulous, impossible-to-predict Final Rule." *VanDerStok*, 2023 WL 7403413, at *12 (Oldham, J., concurring).

Thus, the arbitrary Adjudications show that Appellants are likely to succeed on the merits.

## III. THE DISTRICT COURT FAILED TO ADDRESS APPELLANTS' IRREPARABLE HARM.

The district court did not address Appellants' irreparable harm, but they have unquestionably established it. First, in this Circuit as elsewhere, "unrecoverable economic loss" counts "as irreparable harm." *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (citing *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir.1994)); *accord All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251 (5th Cir. 2023).

There can be no doubt that the Rule is causing commercial Appellants to incur unrecoverable economic loss. SB Tactical makes and sells stabilizing braces, earning 99% of its pre-Rule revenues that way. App. 431; R.Doc. 1-10, ¶ 42. But "[t]he market for the products subject to the Final Rule has evaporated." *Mock*, 2023 WL 6457920, at *17-*18.

The Rule thus caused a 97% collapse in SB Tactical's sales. App. 677; R.Doc. 95-2, ¶ 6; *see also* App. 649-52; R.Doc. 66-1, ¶¶ 10-15. Before the Rule, SB Tactical was a profitable company. App. 677; R.Doc. 95-2, ¶ 7. Now, rather than making

52

money, SB Tactical is losing more than $150,000 per month. App. 677-78; R.Doc. 95-2, ¶¶ 7-8. It has laid off more than half its workforce and has cut salaries. App. 431; R.Doc. 1-10, ¶ 43; App. 678; R.Doc. 95-2, ¶¶ 9-10. More layoffs and salary cuts are imminent. App. 678; R.Doc. 95-2, ¶ 11. The Rule has rendered SB Tactical essentially a "zombie" company, drawing on finite reserve capital and emergency measures to stay afloat. The Rule has likewise caused B&T to lose substantial revenues. App. 435-37; R.Doc. 1-11, ¶¶ 11-17.

For both companies, the financial losses are unrecoverable (and thus irreparable) because Congress has not waived federal sovereign immunity for "money damages." 5 U.S.C. § 702. Consequently, the companies "would not be able to bring a lawsuit to recover their undue economic losses if [ATF]'s rules are eventually overturned." *Iowa Utilities Bd.*, 109 F.3d at 426; *see also Mock*, 2023 WL 6457920, at *13-*16 (brace manufacturer "easily" showed economic "irreparable harm" from Rule). The "loss of" "employee[s]" is also unrecoverable. *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

SB Tactical and B&T also have and will continue to suffer irreparable reputational damage. Their customers purchased braces with the understanding that braces were, as ATF previously said, "perfectly legal accessories for large handguns or pistols." *See* App. 563; R.Doc. 1-20, at 1. Even if ATF allows individuals to turn in or modify their weapons, the companies will suffer an immeasurable "loss of

consumer goodwill," which "qualifies as irreparable harm." *Iowa Utils. Bd.*, 109 F.3d at 426. As B&T explained, its customers "unexpectedly subject[ed] to burdensome federal firearm regulations backed up by criminal penalties" are "likely to direct their ire at B&T even though B&T reasonably relied upon ATF's prior interpretation of the NFA." App. 437; R.Doc. 1-11, ¶ 18; *see also* App. 429-31; R.Doc. 1-10, ¶¶ 35-37, 46 (explaining same issue for SB Tactical).

SB Tactical's reputational harm is deepened because the Rule accuses SB Tactical of "dishonest, unethical conduct." *See Kroupa v. Nielsen*, 731 F.3d 813, 820, 821 (8th Cir. 2013). The Rule wrongly "accuses SB Tactical of trying to develop products to circumvent the NFA and to deceive the public regarding the legal classification of those products." App. 429-31; R.Doc. 1-10, ¶¶ 35-37, 46 (citing Rule, 88 Fed. Reg. at 6,503-06, 6,544-48, 6,555). These inflammatory accusations are wrong and continue to cause irreparable reputational damage.

The 25 States, too, established irreparable harm. Compliance costs from surveying existing law enforcement inventories and removing or registering affected firearms and accessories constitute unrecoverable financial harm. *See, e.g., Chaske*, 28 F.3d at 1473; *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 194 (5th Cir. 2023). ATF even conceded those costs. *See* Rule, 88 Fed. Reg. at 6,567 (acknowledging States' compliance burden); *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th

54

593, 597-600 (5th Cir. 2023) (finding irreparable compliance costs conceded by agency in rule text).

The Rule also irreparably harms the States' power to police crime in over half our country. Forcing law enforcement to catalog or dispense with their braces—and depriving citizens of this important tool of self-defense—will leave States less safe and require States to divert resources to close that gap. *See Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable injury where officials would lose "discretion" over how to "allocate scarce resources"); *Yukutake v. Connors*, 2021 WL 4342320, at *9 (D. Haw. Sept. 23, 2021) (finding irreparable harm where movant was "likely to suffer at least a minor degree of irreparable harm due to the strain on law enforcement resources").

And for many, stabilizing braces also offer the only opportunity to participate in hunting and sport-shooting. Without the braces, States could lose tourism monies and other dollars that flow from those activities, causing irreparable harm to the States' economies. *See, e.g.*, *Noem v. Haaland*, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (observing that a State had a "good argument" that injury to a State's "tourism industry and in turn its sales tax collections" is irreparable); *Anglers of the AU Sable v. U.S. Forest Serv.*, 402 F. Supp. 2d 826, 838 (E.D. Mich. 2005) (finding irreparable harm from, among other things, impacts to tourism and recreation).

Appellate Case: 23-3230     Page: 66     Date Filed: 11/16/2023 Entry ID: 5336284

Richard Cicero also established irreparable harm. Mr. Cicero lost two limbs serving his country in Afghanistan. App. 444; R.Doc. 1-13, ¶ 4. Because of his injuries, Mr. Cicero cannot fire certain pistols without a stabilizing brace. App. 444; R.Doc. 1-13, ¶ 5. Under the Rule, Mr. Cicero can no longer use or even possess pistols with a brace unless he registers them and pays a fee. "These sorts of injuries, i.e., deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

Mr. Cicero's injury is compounded because the Rule "interfere[s] with the exercise of [his] constitutional rights" and of those whom he trains. *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977). The deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1102 (8th Cir. 2013) (quotations omitted); *D.M. by Bao Xiong*, 917 F.3d at 1003.

Appellants have thus shown irreparable injury.

## IV. THE DISTRICT COURT FAILED TO ADDRESS THE BALANCE OF HARMS AND PUBLIC INTEREST.

The balance-of-harm and public-interest "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

56

Granting an injunction would serve the public interest by "preserv[ing] the status quo" that has existed for more than a decade "pending the outcome" of this suit. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (citations and quotations omitted); *see also D.M. by Bao Xiong*, 917 F.3d at 1004 ("The public is served by the preservation of constitutional rights." (citation omitted)). An injunction here would also ensure Appellants are on the same footing as other plaintiffs covered by injunctions in other courts. *See, e.g.*, *Mock*, 2023 WL 6457920, at *14, *18.

On the other side of the ledger, ATF has no interest in enforcing an unlawful regulation. *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021); *see Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("there is generally no public interest in the perpetuation of unlawful agency action.") (citations and quotations omitted). ATF also has no interest in "enforcement clarity," Resp. to Emergency Mot. for Inj. Pending Appeal at 20 ("Emergency Opp'n"), because the Rule "provides no meaningful clarity," *Mock*, 75 F.4th at 585. And in all events, ATF says it has stopped some enforcement already "because ATF does not know" who is covered by existing injunctions, Emergency Opp'n 4 n.1, so, any legitimate interest is minimal.

Given the breadth and geographic dispersal of Appellants' customers and officers, respectively, an injunction should extend nationwide, *Nebraska*, 52 F.4th

57

at 1048, and, at minimum, must include commercial Appellants' "downstream customers," *Mock*, 2023 WL 6457920, at *18.

## CONCLUSION

Because Appellants have established that they will succeed on the merits and that the other three factors favor preliminary relief, this Court should reverse the lower court and remand with instructions to preliminarily enjoin ATF from enforcing the Rule and the Adjudications.

58

November 15, 2023

Respectfully Submitted,

/s/ *Stephen J. Obermeier*
Stephen J. Obermeier
Thomas M. Johnson, Jr.
Michael D. Faucette
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000
Fax: 202.719.7049
SObermeier@wiley.law
TMJohnson@wiley.law
MFaucette@wiley.law
JBroggi@wiley.law
BGarriott@wiley.law

Benjamin J. Sand (ND ID #07981)
**CROWLEY FLECK PLLP**
100 W Broadway Ave
Bismarck, ND 58501
Tel: 701.223.6585
Fax: 701.222.4853
bsand@crowleyfleck.com

*Counsel for Appellants FRAC, SB Tactical, B&T, and Richard Cicero*

/s/ *Lindsay See*
PATRICK MORRISEY
Attorney General
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General

/s/ *Philip Axt*
DREW H. WRIGLEY
Attorney General
PHILIP AXT
Solicitor General

58

Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for Appellant State of West
Virginia*

North Dakota Attorney General's
Office
500 North 9th Street
Bismarck, ND 58501
(701) 328-2210
pjaxt@nd.gov

*Counsel for Appellant State of North
Dakota*

*/s/ Edmund G. LaCour Jr.*
STEVE MARSHALL
Attorney General
EDMUND G. LACOUR JR.
Solicitor General

Alabama Attorney General's Office
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Appellant State of
Alabama*

*/s/ Charles E. Brasington*
TREG TAYLOR
Attorney General
CHARLES E. BRASINGTON
Assistant Attorney General

Alaska Attorney General's Office
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Phone: (907) 269-6612
charles.brasington@alaska.gov

*Counsel for Appellant State of Alaska*

*/s/ Dylan L. Jacobs*
TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General

*/s/ Natalie P. Christmas*
ASHLEY MOODY
Attorney General
NATALIE P. CHRISTMAS (Fla. Bar
1019180)
Counselor to the Attorney General

Florida Attorney General's Office

59

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for Appellant State of Arkansas*

The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for Appellant State of Florida*

/s/ *Stephen J. Petrany*
CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY
Solicitor General

Georgia's Attorney General's Office
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellant State of Georgia*

/s/ *Joshua N. Turner*
RAÚL R. LABRADOR
Attorney General
THEODORE J. WOLD
Solicitor General
JOSHUA N. TURNER
Deputy Solicitor General

Idaho Attorney General's Office
P.O. Box 83720-0010
Boise, ID 83720-0010
(208) 334-2400
(208) 854-8071 (fax)
josh.turner@ag.idaho.gov

*Counsel for Appellant State of Idaho*

/s/ *Betsy M. Denardi*
THEODORE E. ROKITA
Attorney General
BETSY M. DENARDI
Director of Complex Litigation

Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

/s/ *Eric H. Wessan*
BRENNA BIRD
Attorney General
ERIC H. WESSAN
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164

60

(317) 232-6231
Betsy.DeNardi@atg.in.gov

*Counsel for Appellant State of Indiana*

(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Appellant State of Iowa*

/s/ Jesse A. Burris
KRIS KOBACH
Attorney General
JESSE A. BURRIS
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for Appellant State of Kansas*

/s/ Aaron J. Silletto
DANIEL CAMERON
Attorney General
AARON J. SILLETTO
Assistant Attorney General

Kentucky Attorney General's Office
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Aaron.Silletto@ky.gov

*Counsel for Appellant Commonwealth of Kentucky*

/s/ Elizabeth B. Murrill
ELIZABETH B. MURRILL
Solicitor General
J. SCOTT ST. JOHN
Deputy Solicitor General
TRACY SHORT
Assistant Attorney General
MORGAN BRUNGARD
Assistant Solicitor General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

/s/ Justin L. Matheny
LYNN FITCH
Attorney General
JUSTIN L. MATHENY
Deputy Solicitor General

Mississippi Attorney General's Office
550 High Street, Suite 1200
Jackson, MS 39201
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Appellant State of Mississippi*

61

shortt@ag.louisiana.gov
brungardm@ag.louisiana.gov

*Counsel for Appellant State of Louisiana*

/s/ Jeff P. Johnson
ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE
Solicitor General
JEFF P. JOHNSON
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
josh.divine@ago.mo.gov
jeff.johnson@ago.mo.gov

*Counsel for Appellant State of Missouri*

/s/ Christian B. Corrigan
AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN
Solicitor General
PETER MARTIN TORSTENSEN, JR.
Assistant Solicitor General

Montana Attorney General's Office
215 N Sanders St
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov
Peter.Tortstensen@mt.gov

*Counsel for Appellant State of Montana*

/s/ Eric J. Hamilton
MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON
Solicitor General

Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Eric.Hamilton@nebraska.gov

/s/ Brandon F. Chase
JOHN M. FORMELLA
Attorney General
BRANDON F. CHASE
Assistant Attorney General

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Brandon.F.Chase@doj.nh.gov

62

*Counsel for Appellant State of Nebraska*

/s/ Garry M. Gaskins, II
GENTNER F. DRUMMOND
Attorney General
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation
AUDREY A. WEAVER
Assistant Solicitor General

Oklahoma Attorney General's Office
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov
Audrey.Weaver@oag.ok.gov

*Counsel for Appellant State of Oklahoma*

/s/ Charles D. McGuigan
MARTY J. JACKLEY
Attorney General
CHARLES D. MCGUIGAN
Chief Deputy Attorney General

South Dakota Attorney General's Office
1302 E. Highway 4, Suite 1
Pierre, SD 57501
605-773-3215
Charles.Mcguigan@state.sd.us

*Counsel for Appellant State of New Hampshire*

/s/ J. Emory Smith
ALAN WILSON
Attorney General
J. EMORY SMITH, JR.
Deputy Solicitor General

South Carolina Attorney General's Office
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3680
Fax: (803) 734-3677
Email:   ESmith@scag.gov

*Counsel for Appellant State of South Carolina*

/s/ Whitney D. Hermandorfer
JONATHAN SKRMETTI
Attorney General and Reporter
ANDRÉE S. BLUMSTEIN
Solicitor General
WHITNEY D. HERMANDORFER
Assistant Solicitor General

Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Whitney.Hermandorfer@ag.tn.gov

63

*Counsel for Appellant State of South Dakota*

*Counsel for Appellant State of Tennessee*

/s/ Melissa Holyoak
SEAN REYES
Attorney General
MELISSA HOLYOAK
Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Appellant State of Utah*

/s/ Andrew N. Ferguson
JASON MIYARES
Attorney General
ANDREW N. FERGUSON
Solicitor General
KEVIN M. GALLAGHER
Deputy Solicitor General
M. JORDAN MINOT
Assistant Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Appellant Commonwealth of Virginia*

/s/ Ryan Schelhaas
BRIDGET HILL
Attorney General
RYAN SCHELHAAS
Chief Deputy Attorney General

Wyoming Attorney General's Office
Counsel for the State of Wyoming
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786

64

ryan.schelhaas@wyo.gov

*Counsel for Appellant State of*
*Wyoming*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations imposed by Federal Rule of Appellate Procedure 32(a)(7)(B)(i). It contains 12,984 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

 November 15, 2023                          /s/ Stephen J. Obermeier
                                            Stephen J. Obermeier

## CERTIFICATE OF SERVICE

I certify that on November 15, 2023, I electronically filed the foregoing brief with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.

November 15, 2023

/s/ Stephen J. Obermeier
Stephen J. Obermeier

Appellate Case: 23-3230    Page: 79    Date Filed: 11/16/2023 Entry ID: 5336284