# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC., *et al.*,

Plaintiffs-Appellants,

v.

MERRICK B. GARLAND, *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of North Dakota

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

MAC SCHNEIDER
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
  *Attorneys, Appellate Staff
  Civil Division, Room 7260
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530
  (202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

STATEMENT OF THE ISSUE..........................................................................3

STATEMENT OF THE CASE............................................................................4

      A.    Legal Background ...............................................................................4

      B.    Procedural History..........................................................................11

SUMMARY OF ARGUMENT..........................................................................14

STANDARD OF REVIEW .............................................................................. 19

ARGUMENT .................................................................................................... 19

I.    Plaintiffs Are Not Likely to Succeed on the Merits ............................. 19

      A.    Plaintiffs' Claims Are Not Cognizable .....................................19

      B.    The Rule Does Not Conflict with the NFA..............................24

            1.    The Rule Properly Interprets the NFA ...........................24

            2.    Plaintiffs' Contrary Arguments Are Unpersuasive ........................27

                a.    Plaintiffs' Attempt to Categorically Exclude Braced Firearms from Regulation as Short-Barreled Rifles Is Unavailing................................................................27

                b.    Plaintiffs' Attacks on the Rule's Framework Also Fail.................31

                c.    Plaintiffs Cannot Save Their Arguments with Avoidance or Lenity.......................................27

      C.    The Rule Is Not Arbitrary and Capricious ..............................38

      1.       The Rule Reasonably Explains the Factors ATF Applies in
Determining Whether a Weapon Is a Short-Barreled Rifle ...........39

      2.       The Rule Reasonably Considered Reliance Interests and
Costs ................................................................................44

      3.       The PowerPoint Slides Are Not Improper ......................................47

II.    Plaintiffs Have Not Established that the Equitable Factors Favor an
Injunction .................................................................................... 49

    A.    Plaintiffs Have Not Demonstrated Irreparable Harm. ............................49

    B.    The Balance of the Equities Favors the Government ...............................53

    C.    Any Injunction Must Be Limited to the Plaintiffs .....................................54

CONCLUSION ............................................................................... 55

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Adventist Health Sys./SunBelt, Inc. v. HHS*,
17 F.4th 793 (8th Cir. 2021) ............................................................ 45

*American Tort Reform Ass'n v. OSHA*,
738 F.3d 387 (D.C. Cir. 2013) ........................................................ 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................... 13, 21

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......................................................................... 54

*California Cmtys. Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ........................................................ 23

*Caron v. United States*,
524 U.S. 308 (1998) .......................................................................... 36

*Catawba County v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) .......................................................... 41

*Chamber of Commerce v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) ........................................................ 46

*Cigar Ass'n of Am. v. U.S. FDA*,
5 F.4th 68 (D.C. Cir. 2021) ............................................................. 46

*Clark v. Martinez*,
543 U.S. 371 (2005) ..................................................................... 37-38

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................................... 38

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......................................................................... 47

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......................................................................... 39

*FedEx Freight, Inc. v. NLRB*,
816 F.3d 515 (8th Cir. 2016) .......................................................... 39

Appellate Case: 23-3230     Page: 4     Date Filed: 12/19/2023 Entry ID: 5346009

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................................ 37

*Foster v. U.S. Dep't of Agric.*,
   68 F.4th 372 (8th Cir. 2023) ............................................................ 39

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ............................................................. 51

*FTI v. FAA*,
   58 F.4th 230 (5th Cir. 2023) ............................................................ 20

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ...................................................................... 54

*Haaland v. Brackeen*,
   559 U.S. 255 (2023) ........................................................................... 52

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ............................................................................... 41

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 50

*Maracich v. Spears*,
   570 U.S. 48 (2013) ............................................................................. 36

*McKenzie v. Bowen*,
   787 F.2d 1216 (8th Cir. 1986) ......................................................... 20

*MediNatura, Inc. v. FDA*,
   998 F.3d 931 (D.C. Cir. 2021) ......................................................... 53

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................................... 45

*Mississippi Comm'n on Envtl. Quality v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015) ......................................................... 40

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) .......................................... 30-31, 31, 35

*Morehouse Enters., LLC v. ATF*,
   78 F.4th 1011 (8th Cir. 2023) ................................... 19, 49, 51, 52

iv

*Nebraska v. U.S. EPA,*
   812 F.3d 662 (8th Cir. 2016) ................................................................. 47

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) .......................................................................... 13

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................... 19

*Padda v. Becerra,*
   37 F.4th 1376 (8th Cir. 2022) ............................................................... 19

*PDK Labs. Inc. v. DEA,*
   438 F.3d 1184 (D.C. Cir. 2006) ............................................................. 39

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ................................................................................. 20

*Posters 'N' Things, Ltd. v. United States,*
   511 U.S. 513 (1994) ......................................................................... 26, 34

*Salt Lake Tribune Publ'g Co. v. AT&T Corp.,*
   320 F.3d 1081 (10th Cir. 2003) ............................................................. 51

*Saxton v. Federal Hous. Fin. Agency,*
   901 F.3d 954 (8th Cir. 2018) ................................................................. 37

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ............................................................ 15, 25

*Staples v. United States,*
   511 U.S. 600 (1994) ......................................................................... 35, 38

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) ................................................................. 20

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ................................................................. 52

*U.S. Telecom Ass'n v. FCC,*
   825 F.3d 674 (D.C. Cir. 2016) ............................................................. 42

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ............................................................. 38

Appellate Case: 23-3230    Page: 6    Date Filed: 12/19/2023 Entry ID: 5346009

*United States v. Freed,*
   401 U.S. 601 (1971) ........................................................................................ 5

*United States v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ................................................................ 38

*United States v. Hawley,*
   619 F.3d 886 (8th Cir. 2010) ...................................................................... 34

*United States v. Miller,*
   307 U.S. 174 (1939) .................................................................................... 38

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) .................................................................. 33

*United States v. Santoro,*
   242 F. App'x 627 (11th Cir. 2007) .............................................................. 27

*United States v. Stepp-Zafft,*
   733 F. App'x 327 (8th Cir. 2018) ................................................................ 38

*United States v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) .................................................................. 25, 26

*United States v. Thompson/Center Arms Co.,*
   504 U.S. 505 (1992) ................................................................ 4, 27, 30, 33

*United States v. Zeidman,*
   444 F.2d 1051 (7th Cir. 1971) .................................................................... 27

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) ................................................................................ 41, 42

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 704 ...................................................................................... 20, 21

National Firearms Act of 1934 (NFA):
   26 U.S.C. § 5801 *et seq.* ............................................................................ 4
     26 U.S.C. §§ 5801-5802 ...................................................................... 5
     26 U.S.C. §§ 5811-5812 ...................................................................... 5
     26 U.S.C. §§ 5821-5822 ...................................................................... 5
     26 U.S.C. § 5841(c) ............................................................................ 5

Appellate Case: 23-3230    Page: 7    Date Filed: 12/19/2023 Entry ID: 5346009

26 U.S.C. § 5845 ............................................................................... 1
26 U.S.C. § 5845(a)(3) ........................................................ 5, 20, 27, 28
26 U.S.C. § 5845(a)(4) ................................................................... 28
26 U.S.C. § 5845(b) ...................................................................... 33
26 U.S.C. § 5845(c) .............................. 5, 15, 16, 20, 24, 27, 28
26 U.S.C. § 5845(e) ....................................................................... 29
26 U.S.C. § 5845(i) ........................................................................ 28
26 U.S.C. § 5853 .......................................................................... 51

18 U.S.C. § 921(a)(7) ..................................................................... 24

18 U.S.C. § 926(a) ......................................................................... 46

26 U.S.C. § 7421 ........................................................................... 20

26 U.S.C. § 7422 ........................................................................... 52

26 U.S.C. § 7801 ............................................................................. 5

26 U.S.C. § 7805(a) ....................................................................... 46

28 U.S.C. § 1292(a)(1) ..................................................................... 3

28 U.S.C. § 1331 ............................................................................. 3

**Legislative Materials:**

H.R. Rep. No. 73-1780 (1934) ....................................................... 4

H.R. Rep. No. 83-1337 (1954) .............................................. 4, 38, 53

H.R. Rep. No. 90-1956 (1968) ....................................................... 4

**Other Authorities:**

ATF, *Commercially Available Firearms Equipped with a "Stabilizing Brace"
That Are Short-Barreled Rifles*, https://perma.cc/BK6C-BRGQ ................................ 10

ATF, *Common Weapon Platforms with Attached "Stabilizing Brace" Designs
That Are Short-Barreled Rifles*, https://perma.cc/GX8K-A4TW .................................. 10

Appellate Case: 23-3230    Page: 8    Date Filed: 12/19/2023 Entry ID: 5346009

ATF, Docket No. 2021R-08F, *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023), https://perma.cc/96PV-KRB9 .................45

ATF, *PowerPoint Training on Final Rule 2021R-08F*, https://perma.cc/W6ZW-8FUL ........................................................................10

ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 (1961) ............................................. 6, 27

ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 (1961) .......................................6, 27, 29

Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) ............................ 1, 5, 6, 7, 8, 9, 10, 21, 22, 23, 24, 26, 30, 31, 32, 34, 36, 37, 40, 42, 43, 44, 45, 46, 47, 48, 50, 51, 53

Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023) ......................11

Appellate Case: 23-3230    Page: 9    Date Filed: 12/19/2023 Entry ID: 5346009

## INTRODUCTION

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as particularly dangerous weapons. A short-barreled rifle is a "rifle"—that is, a firearm "designed," "made," and "intended" to be "fired from the shoulder"—with a barrel shorter than 16 inches. 26 U.S.C. § 5845. A typical short-barreled rifle is shown below:



*See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6525 (Jan. 31, 2023) (Rule). Such a firearm is designed for the shooter to press the "stock"—the rearward piece—against her shoulder when firing.

Recently, some manufacturers have sold firearms with short barrels and rearward attachments marketed as "stabilizing braces." These manufacturers claim that those firearms are not rifles because they are not designed to be fired from the shoulder. Instead—these manufacturers claim—the stabilizing brace is designed to rest against or wrap around a shooter's forearm to assist with one-handed firing. Many braced weapons, however, are indistinguishable from those with stocks:



*See* App. 656; R. Doc. 90, at 4 (top item equipped with "brace" and bottom equipped with traditional stock). Such weapons should therefore be sold in compliance with the NFA.

In response to this evasion of federal law—and resulting confusion among the public—the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued an interpretive rule explaining when a weapon is a short-barreled rifle within the meaning of the NFA. The Rule explains that the agency had previously issued individual determinations evaluating whether particular braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to the manufacturer's stated intent. The Rule therefore clarifies that whether a braced weapon is designed and intended to be fired from the shoulder does not turn solely on the manufacturer's claimed intent; instead, the standard also focuses on the weapon's objective design features and other evidence. The Rule then sets forth the evidence that ATF will consider when classifying whether any particular firearm equipped with a brace is designed and intended to be shoulder-fired.

Plaintiffs challenged the Rule and sought preliminary injunctive relief. The district court properly denied that motion, concluding that plaintiffs are unlikely to succeed on the merits of their claims.

## STATEMENT OF JURISDICTION

The district court denied plaintiffs' motion for a preliminary injunction on September 12, 2023. *See* App. 675; R. Doc. 90, at 23. Plaintiffs filed a timely notice of appeal from that denial on October 5, 2023. *See* App. 18. The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Plaintiffs—an individual, two manufacturers of stabilizing braces, a firearms advocacy group, and 25 states—claim that the Rule and PowerPoint slides created by the agency are invalid. In particular, they claim that the NFA categorically excludes braced weapons from its definition of short-barreled rifle; that the Rule improperly fails to consider as relevant any design features of a weapon that facilitate one-handed firing; that the Rule improperly considers evidence of third-party conduct—like the general use of a particular weapon in the community—rather than only considering a manufacturer's own conduct; and that the Rule's overall framework and individual factors are arbitrary and capricious. Plaintiffs further claim that the PowerPoint slideshows lack a reasoned explanation.

3

Plaintiffs moved for a preliminary injunction on these bases. The district court denied that motion, concluding that plaintiffs were unlikely to succeed on the merits of any claim.

The issue presented is whether the district court properly denied plaintiffs' motion for a preliminary injunction.

- *Bennett v. Spear*, 520 U.S. 154 (1997)

- *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011 (8th Cir. 2023)

- *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016)

- 26 U.S.C. § 5845(a)(3)

- 26 U.S.C. § 5845(c)

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** The National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

4

For those firearms, the NFA establishes a registration-and-taxation scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). Under the statute, importers, manufacturers, and dealers in regulated firearms including short-barreled rifles must register and pay an annual special occupational tax of $1000 or $500. *See* 26 U.S.C. §§ 5801-5802. In addition, a qualified manufacturer must register each firearm made. *See id.* § 5841(c).

Individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, they must describe the firearm; submit identifying information; and pay a $200 tax per firearm. *See id.* To transfer such firearms, a transferor must go through the same process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

**2.** ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

As shown in the previous images, *see supra* pp. 1-2, a short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that the stock, like many firearm components, is often

5

detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 (1961); ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 (1961).

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g., id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks:

6



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace). And as shown in marketing materials and trade magazines, many firearms equipped with braces are designed to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both "arm braces"; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation

7

omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6501-02. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and there was "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide that clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead, the agency will consider whether other relevant evidence, such as the firearm's

Appellate Case: 23-3230    Page: 17    Date Filed: 12/19/2023 Entry ID: 5346009

"objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570.

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. But the Rule also makes clear that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon

9

might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

The Rule also provides compliance options for individuals who possess unregistered brace-equipped short-barreled rifles, with the Department exercising its enforcement discretion to permit registration by May 31, 2023, without penalty or tax. 88 Fed. Reg. at 6480-81. Finally, because not all previous classification letters had followed a proper approach, the Rule clarifies that those letters are no longer valid. *Id.*

Finally, alongside the Rule, the agency published a list of "commercially available firearms" and other "common weapons platforms" as representative examples of firearms that it expected would eventually be classified as short-barreled rifles. *See* ATF, *Commercially Available Firearms Equipped with a "Stabilizing Brace" That Are Short-Barreled Rifles*, https://perma.cc/BK6C-BRGQ; ATF, *Common Weapon Platforms with Attached "Stabilizing Brace" Designs That Are Short-Barreled Rifles*, https://perma.cc/GX8K-A4TW; ATF, *PowerPoint Training on Final Rule 2021R-08F*, https://perma.cc/W6ZW-8FUL. This was done to "give the public and

10

manufacturers as much notice as possible" to aid compliance with the statute before May 31. App. 644-45; R. Doc. 63-1, at 3-4.[1]

## B. Procedural History

Plaintiffs—an individual, two manufacturers of stabilizing braces, a firearms advocacy group, and 25 states—filed this suit. *See* App. 23-30; R. Doc. 1, at 4-11. Their complaint claims that the Rule exceeds ATF's statutory authority, is arbitrary and capricious, and is unconstitutionally vague. *See* App. 56-57, 59; R. Doc. 1, at 37-38, 40. The complaint also claims that the agency's PowerPoint identifying likely short-barreled rifles is inadequately explained. *See* App. 58-59; R. Doc. 1, at 39-40. After filing their complaint, plaintiffs moved for a preliminary injunction.

The district court denied plaintiffs' motion, concluding that they were unlikely to succeed on the merits of any claim. *See* App. 653-75; R. Doc. 90, at 1-23. First, the district court concluded that the Rule correctly construed the relevant statutory provisions. The court explained that the Rule was consistent with the statutory definition of "rifle," which "uses terms such as 'designed[,]' 'redesigned,' 'remade,' and 'intended'" that "necessarily require[]" the agency to "evaluate objective weapon

---

[1] Although ATF intended to "issue formal classification letters to manufacturers explaining its reasoning and analysis" for each determination, App. 644; R. Doc. 63-1, at 3, ATF stopped issuing those letters after it was enjoined from enforcing the Rule against plaintiffs in cases that included membership organizations because ATF did not know whether any manufacturer to whom it might issue a letter was covered by an injunction. *See, e.g.*, Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023) (enjoining ATF from enforcing the Rule against members of the Firearms Policy Coalition).

characteristics, and perhaps conduct[,] to decide whether a particular firearm is subject to the NFA." App. 665; R. Doc. 90, at 13 (quotation omitted). The court rejected plaintiffs' arguments that the NFA categorically excludes firearms made from pistols, because "the very language spelled out in the definition of 'rifle'" shows that Congress intended to capture all "weapons with a barrel of less than 16 inches in length and intended to be fired from the shoulder to be encompassed" with the statute. App. 667; R. Doc. 90, at 15. And recognizing that there was no "genuine" ambiguity that the rule of lenity could help resolve, the court rejected plaintiffs' reliance on that principle. App. 666-67; R. Doc. 90, at 14-15 (quotation omitted).

Second, the district court concluded that the Rule was not arbitrary and capricious because it was reasonable and reasonably explained. *See* App. 668-70; R. Doc. 90, at 16-18. Rejecting plaintiffs' objections that the considerations identified by the Rule are "holistically arbitrary" or "individually arbitrary," the court explained that the statutory "inquiry is whether a firearm is designed or intended to be fired from the shoulder" and it is thus appropriate for the agency to assess only whether evidence bears on the design and intent of a firearm to be fired from the shoulder. *See* App. 668-70; R. Doc. 90, at 16-18. The court then reiterated that an agency need only "define and explain the criteria applied" to assess the design and intent of a firearm to be fired from the shoulder, concluding that the agency did so for each criterion throughout the Rule. *Id.* (quotation omitted).

Appellate Case: 23-3230    Page: 21    Date Filed: 12/19/2023 Entry ID: 5346009

The district court was no more persuaded by plaintiffs' argument that the agency's regulatory impact statement was arbitrary and capricious. The court explained that the agency "included a 40-page discussion of costs," even doubling estimates "to account for any incorrectly low numbers." App. 670-71; R. Doc. 90, at 18-19 (quotation omitted). The court thus determined that the agency's analysis was "adequate" and "reasonable." *Id.* (quotation omitted).

Next, the district court concluded that plaintiffs could not challenge the slideshows posted to the agency's website because they were not final agency action, as they did not engender "legal consequences." App. 673; R. Doc. 90, at 21 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The court reasoned that the slideshows had no "direct and appreciable legal consequence," because they were just "representative of how the ATF will apply the definition of 'rifle' to firearms that are equipped with a 'stabilizing brace'" and only "forecast[ed] the ATF's position on particular weapons as representations on their position." App. 674; R. Doc. 90, at 22 (emphasis and quotation omitted).

Finally, the district court emphasized that plaintiffs did not bring a Second Amendment challenge. *See* App. 662-63; R. Doc. 90, at 10. The court explained that, in any event, the Rule does not implicate the Second Amendment because "reasonable licensing regimes associated with ownership of a firearm" are not unconstitutional, *id.* (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring)), and the Rule and the NFA do "not ban

13

stabilizing braces or firearms equipped with them" but merely "require[] individuals and entities to comply with the NFA's statutory requirements," *id.* Moreover, "uniquely dangerous weapons, including short-barreled rifles, are not protected by the Second Amendment." *Id.* (emphasis omitted).

## SUMMARY OF ARGUMENT

The Rule is nothing extraordinary: an agency, charged with enforcing a statute, provided clarification to the public of how it interprets a statutory term in response to widespread confusion and evasion of statutory constraints. For years, individuals who wished to possess a short-barreled rifle without complying with the NFA's requirements simply bought a device marketed as a "stabilizing brace," attached it to a firearm, and used the resulting combination as a rifle. Manufacturers claimed that such devices assisted disabled individuals with one-handed firing. But that claim could not be squared with reality: many devices were not useful for one-handed firing and served only to permit the shooter to fire from the shoulder. True braced pistols—which need not be registered under the NFA—were not a dominant part of the market.

In the face of these market realities and obvious side-stepping of federal law, ATF issued the Rule. The district court correctly ruled that plaintiffs are unlikely to succeed on the merits of their contentions that the Rule is invalid. This Court should affirm.

14

**I.** The district court correctly concluded that plaintiffs had not demonstrated a likelihood of success on the merits.

**A.** Plaintiffs' APA claims are not cognizable. The Rule does not change the scope of the statutory provisions at issue, which are the source of the requirements that attach to short-barreled rifles. Thus, the Rule is not final agency action challengeable under the APA, because ATF's decision to articulate for the public its understanding of the statute does not determine any legal rights or impose any legal obligations. Similarly, the PowerPoint slideshows that plaintiffs challenge have no independent legal authority but instead only inform the public of ATF's views.

**B.** Even assuming plaintiffs challenge final agency action, such a challenge cannot succeed. The Rule properly interprets the statute. A weapon constitutes a "rifle" if, as relevant here, it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). In interpreting that provision, the Rule properly clarifies that ATF need not uncritically accept stated intent but may also consider objective evidence of intent. This approach of using objective evidence to "ferret[] out a party's" true intent is a familiar one in the law and has been approved in the context of the NFA specifically. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016). The Rule also properly identifies evidence that ATF believes will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder.

Appellate Case: 23-3230     Page: 24     Date Filed: 12/19/2023 Entry ID: 5346009

Plaintiffs' substantive challenges to the Rule lack merit. Plaintiffs' attempt to categorically exclude braced weapons from the reach of the NFA finds no support in the text of the statute, which covers *all* short-barreled firearms "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c), regardless of whether they were originally manufactured as such. Nor does plaintiffs' bare assertion that the weapons at issue are really "pistols" advance their case. And plaintiffs cannot save their atextual interpretation with resort to principles divined from a supposed congressional purpose to regulate only devices that, in plaintiffs' view, make firearms more dangerous; not only are such arguments insufficient to overcome the NFA's plain text but they also fail on their own terms.

Equally unpersuasive is plaintiffs' contention that the Rule's framework misinterprets the statutory design-and-intent standard; these arguments reflect a misapprehension of both the Rule and the statute. Contrary to plaintiffs' views, the Rule applies well-established principles of determining a party's intent to the specific context of braced weapons. The NFA employs an intent-based standard common throughout the criminal law, and plaintiff identifies no ambiguity in that standard sufficient to trigger the rule of lenity.

**C.** Plaintiffs' procedural claims are equally unavailing. Although plaintiffs argue that the Rule's factors are unreasonable, plaintiffs fail to engage with the lengthy explanations given in the Rule for both the overall approach and the individual

factors. Nor do plaintiffs identify any specific firearms for which they believe the Rule's factors—together or individually—lead to an incorrect classification.

Moreover, plaintiffs' attacks on the agency's cost-benefits analysis and consideration of reliance interests are unpersuasive. The agency considered reliance interests, and plaintiffs identify no statutory requirement that ATF quantify the costs of the Rule. Regardless, plaintiffs' discussion of economic costs is beside the point: ATF properly explained that it was issuing the Rule to articulate its best interpretation of the NFA, not for any reason related to the economic costs and benefits of the Rule.

Nor do plaintiffs persuasively argue that the PowerPoint slideshows are unreasonably explained. To the contrary, the slideshows themselves are reasonable for the purpose that they serve: putting the public on notice of ATF's view that certain braced weapons are short-barreled rifles.

**II.** Even if plaintiffs could demonstrate a likelihood of success on the merits, they would be unable to justify a preliminary injunction.

**A.** No plaintiff has demonstrated irreparable harm from the Rule, which does nothing more than interpret the NFA. SB Tactical's claims of harm from reduced sales following the Rule are unavailing, both because those harms are attributable to SB Tactical's customers' choices and not to the Rule and because SB Tactical could mitigate any concerns by manufacturing designs that are not short-barreled rifles or by simply complying with the NFA. The States' underdeveloped claims of irreparable

17

harm fare no better, both because the ordinary compliance costs they assert do not suffice to show irreparable harm and because the States cannot assert *parens patriae* claims on behalf of their citizens. And the individual plaintiff's claim that he is harmed by having to comply with the NFA fails, both because the NFA's requirements are not sufficiently burdensome to constitute irreparable harm and because the Rule's compliance options permitted him to avoid much of the burden of those requirements anyway.

**B.** In addition, the balance of equities and the public interest weigh against relief. ATF's previous case-by-case approach to classifying braced weapons led to confusion, regulatory inconsistency, and circumvention of the controls Congress deemed necessary for public safety. The Rule alleviates those problems by providing a clear explanation of ATF's understanding of the statute's application to braced firearms, and any injunction would thus undermine the substantial public interests that the Rule advances.

**C.** In all events, plaintiffs cannot justify their request for broad relief. It is well settled that an injunction—which is an extraordinary remedy—must be limited to redressing irreparable harm to specific plaintiffs before the Court. Thus, even if this Court concludes that some plaintiffs are entitled to an injunction, any relief must be limited to the specific plaintiffs the Court determines have demonstrated sufficient irreparable harm.

Appellate Case: 23-3230    Page: 27    Date Filed: 12/19/2023 Entry ID: 5346009

## STANDARD OF REVIEW

This Court reviews "the denial of a preliminary injunction for abuse of discretion." *Padda v. Becerra*, 37 F.4th 1376, 1381 (8th Cir. 2022). "A district court abuses its discretion when it rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (alteration and quotation omitted).

## ARGUMENT

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1016 (8th Cir. 2023) (quotation omitted). A movant therefore bears the burden to establish that "(1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his favor; and (4) an injunction is in the public interest." *Id.* (quotation omitted). The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet that burden at each step.

## I.  Plaintiffs Are Not Likely to Succeed on the Merits

### A.  Plaintiffs' Claims Are Not Cognizable

At the outset, plaintiffs cannot succeed in this suit because their attacks on the Rule and the agency's PowerPoint slideshows are not cognizable under the APA.[2]

---

[2] This is not an exhaustive account of the threshold barriers to plaintiffs' claims as they proceed beyond this interlocutory appeal. For example, plaintiffs' attacks on ATF's interpretation of the NFA must clear the Tax Anti-Injunction Act, which

*Continued on next page.*

19

Neither the Rule nor the slideshows constitute "final agency action." *See* 5 U.S.C. § 704.

**1.** As the district court recognized, App. 672-73; R. Doc. 90, at 20-21—and as plaintiffs do not contest in their opening brief—the Rule is an interpretive rule: it "clarifies, rather than creates, law," *FTI v. FAA*, 58 F.4th 230, 240 (5th Cir. 2023) quotation omitted).

Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). And a rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3). The Rule articulates ATF's understanding of the best interpretation of that standard and identifies evidence that ATF thinks will generally be probative of the statutorily required determination of design and intent. It is therefore a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). In issuing the Rule, ATF did not "claim to be exercising authority to itself make positive law." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Instead, the Rule "clarifies or explains existing law"—the NFA. *McKenzie v. Bowen*, 787 F.2d 1216, 1222 (8th Cir. 1986).

---

generally prohibits suits seeking to "restrain[] the assessment or collection of any tax." 26 U.S.C. § 7421.

20

Reflecting this purpose, the Rule repeatedly states that it does not have the independent force and effect of law and that the NFA and GCA are the source of ATF's authority to regulate short-barreled rifles. *See, e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 (similar); *id.* at 6501 similar). Thus, in an enforcement proceeding, the government would not rely on the Rule to establish whether a weapon is a short-barreled rifle; instead, the adjudicator would apply the statute.

This proper understanding of the Rule makes clear that the relevant portions of the Rule are not final agency action challengeable under the APA. *See* 5 U.S.C. § 704. To be reviewable under the APA, agency action must be "the consummation of the agency's decisionmaking process" and an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation omitted). ATF's articulation of the best understanding of the statute does not itself determine any legal rights or impose any legal obligations. *Cf. American Tort Reform Ass'n v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013) (interpretive rules are generally not final agency action "because they are not finally determinative of the issues or rights to which they are addressed" (quotation and alteration omitted)). Plaintiffs have not attempted to

21

demonstrate that the particular braced firearms they possess or distribute will be classified as "short-barreled rifles" under the Rule but would not be under the correct interpretation of the statute. If plaintiffs disagree with ATF about whether any particular braced firearm is a short-barreled rifle, the proper course is to seek relief specific to that firearm under the statute, not mount a broadside attack on the Rule—which merely describes the methodology ATF uses to classify braced firearms.

**2.** For similar reasons, plaintiffs' separate challenges to the PowerPoint slideshows that the agency issued alongside the Rule also fail. As the district court correctly concluded, App. 673-74; R. Doc. 90, at 21-22, those slideshows are not final agency action.

Like the Rule, the slideshows themselves have no legal consequences. ATF made clear that the slideshows were posted to give notice and "inform members of the public of how they might be impacted" by future application of the interpretation reflected in the Rule. 88 Fed. Reg. at 6514. More generally, as explained, if ATF were to take enforcement action against a manufacturer or owner of any braced firearm shown in a slideshow, the sole question would be whether the firearm is a rifle under the statute, not whether the weapon was identified in the slideshow.

In arguing otherwise, plaintiffs contend (at 49) that the slideshows are final because they are "dispositive of ATF's position as to the depicted configurations." But even assuming plaintiffs are correct, that would not establish finality. As the D.C. Circuit has explained, even if an agency memorandum "unequivocally declares" the

22

agency's "definitive interpretation" of a statute, the memorandum will be non-final if it "has no direct and appreciable legal consequences"—if, in other words, it "is all bark and no bite." *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637-38 (D.C. Cir. 2019). Like the memorandum at issue in that case, the slideshows here—and, indeed, the Rule itself—"ha[ve] no independent legal authority": no party may "rely on [them] as independently authoritative"; an entity that "refuses to comply" with the PowerPoint slideshows "faces no penalty or liability" for noncompliance with the slideshows' determinations; and an entity that disagrees with them may challenge the agency's interpretation, and receive judicial review of those challenges, in any future enforcement proceeding. *See id.*

Finally, plaintiffs emphasize (at 49) that the Rule states that certain compliance actions "will need to be taken" for "firearms with 'stabilizing braces' that are short-barreled rifles." 88 Fed. Reg. at 6514. But that language is irrelevant to the finality question; of course, any person who possesses a short-barreled rifle must comply with the NFA. But the slideshows themselves do not impose any obligations. Instead, they contain cautionary guidance intended to provide additional information to the public in advance of the expiration of the Rule's discretionary enforcement period. *See id.*

Because plaintiffs challenge non-final agency action, they can demonstrate no chance of success on the merits of their APA claims.

23

### B. The Rule Does Not Conflict with the NFA

#### 1. The Rule Properly Interprets the NFA

Even assuming the Rule is subject to APA review, plaintiffs are not likely to succeed on the merits of their claims. The Rule properly interprets the statutory definition of "rifle." Under the NFA, a firearm is a "rifle" if it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c).[3] The Rule tracks this language: A firearm with a stabilizing brace is a "rifle" when it "provides surface area that allows the weapon to be fired from the shoulder" and other evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule interprets the statute, applying the definition of rifle to a weapon equipped with a stabilizing brace.

Beyond this, the Rule primarily clarifies two features of the statutory inquiry. First, the Rule makes clear that whether a braced firearm is designed and intended to be fired from the shoulder cannot be determined solely by reference to a manufacturer's claimed intent but instead must be determined by evaluating other evidence of intent. *See* 88 Fed. Reg. at 6495. Second, the Rule catalogs the sort of evidence that ATF considers probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. *See id.* at 6569-70. Both features of the Rule are consistent with the statute.

---

[3] The Gun Control Act likewise defines "rifle" to mean "a weapon designed," "made," and "intended to be fired from the shoulder." 18 U.S.C. § 921(a)(7).

24

First, the NFA does not require ATF to uncritically accept a manufacturer's statements about whether its product is designed and intended to be fired from the shoulder—a proposition plaintiffs do not seem to dispute. To the contrary, it is a "very familiar [approach] in the law" to use "objective" evidence to "ferret[] out a party's" true intent, notwithstanding the party's subjective representations. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016) (collecting cases). That approach makes particular sense in the context of the NFA because "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence" indicates is not "actually" the intended use. *Id.* at 602.

Multiple courts of appeals have therefore held that a product's intended use may be determined by reference to objective evidence of intent, including evidence of design features. For example, in *Sig Sauer*, the First Circuit upheld ATF's determination that a product was a silencer. Although the manufacturer claimed that the product was "intended for use as a muzzle brake"—that is, a "device that is added to a gun to reduce recoil"—ATF examined the product and determined, based primarily on evidence derived from the design of the product, that it was in fact intended for use only as a silencer. *See Sig Sauer*, 826 F.3d at 600, 602.

Similarly, in *United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996), the Seventh Circuit affirmed a conviction for possession of an unregistered and unmarked silencer, in violation of the NFA, based on objective evidence of intent. Although the

Appellate Case: 23-3230   Page: 34   Date Filed: 12/19/2023 Entry ID: 5346009

defendant in that case testified that "he had designed and manufactured" the item in question "to be a muzzle break," not a silencer, the court explained that there was evidence in the record "casting doubt on his professed intentions." *Id.* at 232. The court thus concluded, based on that evidence, that a jury could reasonably infer that the defendant's "description of the [item] was not credible" and that he had made it "to be a silencer." *Id.*

Second, ATF also properly identified evidence that will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. In the Rule, ATF identified as potential evidence both the design features of the weapon—such as whether the weapon includes certain features useful for firing from the shoulder but not useful for one-handed firing—and the way the weapon is marketed and used in the real world. And the Rule's focus on design features and direct evidence is well-supported. As explained, it has long been established— including specifically in the NFA context—that a product's design may be probative of the question how the product is intended to be used. Likewise, it is appropriate for an agency to consider a manufacturer's "marketing materials" and the "likely use of the weapon in the general community" as direct and indirect evidence to test the manufacturer's "stated intent." 88 Fed. Reg. at 6479. "[T]he actual use of the item in the community" may be relevant to whether a product was "primarily intended" for a particular use. *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519-20 (1994) (quotation omitted).

26

## 2. Plaintiffs' Contrary Arguments Are Unpersuasive

### a. Plaintiffs' Attempt to Categorically Exclude Braced Firearms from Regulation as Short-Barreled Rifles Is Unavailing

**1.** Plaintiffs first attempt (at 21-25) to limit the NFA's regulation of "a rifle having a barrel or barrels of less than 16 inches in length," 26 U.S.C. § 5845(a)(3), to firearms "originally manufactured" as rifles. Br. 23. But that interpretation of the statute cannot be squared with the NFA's express terms.

The NFA defines "rifle" as a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The definition thus includes not just weapons "designed" and "made" to be shoulder-fired but also weapons "redesigned" and "remade" to be shoulder-fired, *id.*, expressly sweeping in weapons that were not rifles as originally manufactured but that have been redesigned or remade—such as by adding a brace or stock—to be rifles. *Cf. United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 513 n.6 (1992) (plurality opinion) (pistol "ha[s] been 'made' into a rifle" for NFA purposes when packaged with carbine kit and rifle stock); *see also, e.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007) (per curiam) (similar). Indeed, it has long been true that a short-barreled rifle's stock may be detachable or sold separately, *see e.g.*, Rev. Rule 61-45, 1961-1 C.B. 663; Rev. Rule 61-203, 1961-2 C.B. 224, but whether the stock is attached before or after sale

27

has never been held relevant—by any court or by the agency—to whether the finished product is a rifle.

Failing to find any support for their original-manufacture limitation in the statutory text, plaintiffs primarily contend (at 22-24) that this Court should divine such a limitation in § 5845(a)(3) by juxtaposing that provision with § 5845(a)(4), which defines as a "short-barreled rifle" any "weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length," *see* 26 U.S.C. § 5845(a)(4). Because the NFA defines the term "make" to exclude manufacturing by licensed manufactures, *id.* § 5845(i), § 5845(a)(4) reaches only short-barreled rifles "made" by non-licensees—for example, by an individual who modifies a long-barreled rifle that he purchased from a licensee. Thus, plaintiffs contend, § 5845(a)(3) should have the opposite reach, sweeping in only firearms that are short-barreled rifles as originally manufactured.

But that contention fails. Most importantly, it finds no support in the text of § 5845(a)(3). That provision expressly reaches any "rifle"—that is, a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c)—having "a barrel or barrels of less than 16 inches in length," *id.* § 5845(a)(3). It does not contain the limitation plaintiffs would graft onto it. Instead, the text makes clear that Congress intended to encompass all short-barreled rifles, however manufactured or made. Nor does interpreting § 5845(a)(3) in this way render § 5845(a)(4) superfluous, as plaintiffs claim. Subsection (a)(4) uniquely

covers both (1) modified rifles where the barrel is longer than 16 inches but the overall length is less than 26 inches; and (2) a short-barreled weapon "made from a rifle," even if the weapon is no longer a rifle (say, because the stock has been removed).

**2.** Plaintiffs' argument (at 22) that the NFA intentionally excludes pistols is equally unpersuasive. For one, the NFA's only reference to "pistols" is to exclude them from its catch-all definition of "any other weapon," *see* 26 U.S.C. § 5845(e); the definitions at issue in this case make no mention of pistols. And plaintiffs' characterization of braced firearms as "pistols" begs the question; as the Rule explains, many such firearms are actually "rifles." That in some circumstances these braced firearms could function as pistols were the brace removed is irrelevant. Any short-barreled rifle equipped with a stock may function as a pistol if the weapon is remade or redesigned to remove the stock. *See, e.g.*, Rev. Rule 61-203, 1961-2 C.B. 224. But ATF is required to assess the weapon as it finds it, not to hypothesize about how the weapon might function if components were removed.

**3.** Unable to find any textual support for their position, plaintiffs advance (at 24-25) a purposivist argument that the NFA's regulation of short-barreled rifles was intended to target modifications of rifles to make them more dangerous but that braces modify pistols to make them less dangerous. That is incorrect. For one, nothing in the statute directs ATF—much less courts or regulated entities—to engage in free-floating "dangerousness" comparisons. Instead, as explained, the statute

29

reaches certain carefully defined firearms, and nothing in the relevant definitions turns on whether a short-barreled rifle was originally made from a rifle or from a pistol.

Regardless, regulating all short-barreled rifles—including those made from heavy pistols—comports with Congress' purpose in enacting the statute. Congress regulated short-barreled rifles, rather than long-barreled rifles or handguns, because it was concerned with the unique combination of concealability and firepower. On the one hand, the "compact size" of short-barreled rifles "assists with concealability," which makes them attractive for criminals. 88 Fed. Reg. at 6499; *see Thompson/Center Arms Co.*, 504 U.S. at 517. At the same time, they have a "heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition"—because these heavy weapons tend to "incorporate receivers that accept cartridges primarily designed for rifles." 88 Fed. Reg. at 6499, 6518. And "the ability to shoulder" such firearms means that criminals can sustain fire with more lethal accuracy. *Id.* at 6499. And none of those features of a short-barreled rifle depends on whether it was made by shortening the barrel of a rifle or adding a stock to a pistol.

Plaintiffs' comparisons between ordinary pistols and braced short-barreled rifles do not advance the ball. Although plaintiffs state (at 24) that braced weapons are less concealable than pistols, the point remains that braced short-barreled rifles retain an element of concealability compared to long-barreled rifles. And although plaintiffs say that braced pistols' increased accuracy "promotes safety," Br. 24-25 (quoting *Mock*

30

*v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring)), "accuracy, at least in the hands of killers, is not 'safe'—it is lethal," *Mock*, 75 F.4th at 596 (Higginson, J., dissenting). Particularly when combined with the heavy ammunition and increased concealability that braced short-barreled rifles offer, that increased accuracy gives rise to exactly the concerns that animated Congress' enactment of the NFA. Indeed, braced weapons have been used in two mass shootings where 19 combined victims were killed; have been classified 104 times and traced 63 times as a part of criminal investigations; and were subject to 105 cases or investigations at the time of the Rule. 88 Fed. Reg. at 6499.

> **b.    Plaintiffs' Attacks on the Rule's Framework Also Fail**

Aside from their contention that braced weapons are categorically excluded from the reach of the NFA, plaintiffs also argue that the Rule violates the statute by incorrectly weighing evidence of whether a particular firearm was designed and intended to be fired from the shoulder. This argument is meritless.

**1.** Failing to advance their case, plaintiffs first argue (at 25-28) that the Rule "refus[es] to consider all evidence that a braced pistol is principally for unshouldered use," claiming, in particular, that the Rule ignores a manufacturer's stated intent for use of the product and a product's ability to be fired with one hand.

This argument reflects plaintiffs' misunderstanding of the Rule. Two of the enumerated types of evidence that the Rule says may be probative of the question

whether a braced firearm is a "rifle" are the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community." 88 Fed. Reg. at 6480. To the extent that plaintiffs' hypothetical one-armed-fired weapon is not marketed or promoted as shoulder-fired or is not principally used as a shoulder-fired firearm, that evidence would weigh in favor of the firearm's not being a rifle. And if plaintiffs have a particular weapon in mind for which they believe such evidence would indicate that the weapon is not designed to be fired from the shoulder, they are free to submit that weapon and supporting evidence in a request for classification and seek review if dissatisfied.

To the extent plaintiffs suggest the Rule impermissibly declines to focus on whether a braced firearm's features facilitate one-handed firing (rather than focusing on if its features suggest a design to be shoulder-fired), that suggestion misunderstands the statute. As explained, the bottom-line inquiry articulated in the Rule is—consistent with the statute—whether any particular braced weapon "is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6480. That inquiry necessarily focuses on the features of the firearm that reflect an intent to facilitate shoulder-firing.

Plaintiffs' suggestion that the agency is required to consider how effective a weapon would be at supporting one-handed firing is also unavailing because it rests on the incorrect premise (at 26, 28) that a braced weapon is a "rifle" only if it is

"principally" designed to be fired from the shoulder. But nothing in the NFA incorporates such a principal-design limitation. Thus, courts have repeatedly rejected the similar suggestion that a weapon may be a rifle only if it is designed "to be fired exclusively from the shoulder." *United States v. Rose*, 695 F.2d 1356, 1357-58 (10th Cir. 1982) (collecting cases); *compare, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" to include "any part designed and intended *solely and exclusively*" for "use in converting a weapon into a machinegun" (emphasis added)), *with id.* § 5845(c) (defining "rifle" to include a weapon "designed," "made," and "intended to be fired from the shoulder"). Because the NFA includes no such exclusive- or principal-design limitation, a braced firearm that is designed to be shoulder-fired is a rifle even if it is also designed to be fired in other ways. Consistent with that aspect of the statute, the Rule focuses on whether a firearm includes objective design features indicative of a shoulder-firing design.

Equally unavailing is plaintiffs' attempt to support their erroneous reading of the NFA (at 26) with a citation to *Thompson/Center Arms Co.*, 504 U.S. at 513. There, the plurality construed the NFA word "made" as applied to a "pistol and carbine" kit that contained parts that could be used to make a pistol, a short-barreled rifle, *or* a regular rifle. *See id.* at 509, 512-13, 518. Given the multiple possible ultimate configurations of the assembled firearm, the plurality determined that the kit had "not been 'made' into a short-barreled rifle"—at least until the purchaser actually assembled a short-barreled rifle from the components. *Id.* at 517-18. That analysis is

33

unilluminating in this case, where the Rule reflects ATF's understanding that the determination whether a braced firearm is a rifle should only be made with respect to specific brace-and-platform combinations.

**2.** Plaintiffs separately argue (at 28-29) that the Rule impermissibly considers as relevant evidence the activities of entities beyond the manufacturer, such as "marketing materials" which may be produced by third parties or the "use of the weapon by the general community." According to plaintiffs, such third-party activities are "irrelevant to a manufacturer's intent." Br. 29. That argument is incorrect.

As an initial matter, the Rule does not attempt to assess third-party intent. Instead, the Rule recognizes—consistent with black-letter law—that "the actual use of [an] item in the community" may be relevant to whether a product was "primarily intended" for a particular use. *Posters 'N' Things*, 511 U.S. at 519-20 (1994); *see also* 88 Fed. Reg. at 6544-48. The agency is not required to blind itself to such probative evidence of how a braced firearm is designed and intended to be used. To the contrary, similar circumstantial evidence is commonplace in both civil and criminal proceedings because a manufacturer's expectations about how its product will be used illuminate how it intends the product to be used. *Cf. United States v. Hawley*, 619 F.3d 886, 896 (8th Cir. 2010) ("[A] reasonable factfinder typically may infer that a person intends the ordinary consequences of his voluntary acts."). And although plaintiffs cite (at 29) various courts of appeals cases construing other statutes, they fail to engage with the commonsense analysis reflected in the Supreme Court's decision in

*Posters 'N' Things*—which post-dates two of their three cited cases—or to explain how the cases analyzing different statutory language apply to the NFA specifically.

Finally, to the extent that plaintiffs express an additional concern that this aspect of the Rule "will wrongly 'hold citizens criminally liable for the actions of others'" unknown to them, Br. 28-29 (quoting *Mock*, 75 F.4th at 586), that concern is unavailing. The Supreme Court has made clear that, in a prosecution under the NFA, the government is "required to prove beyond a reasonable doubt that" the defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a" short-barreled rifle. *Staples v. United States*, 511 U.S. 600, 602 (1994). And any plaintiff who wishes to obtain additional clarity about a particular firearm may submit that firearm to ATF for classification.

### c. Plaintiffs Cannot Save Their Arguments with Avoidance or Lenity

Failing to support their claim that the Rule is unlawful with the ordinary tools of construction, plaintiffs fall back on the rule of lenity (at 30-32) and the constitutional avoidance doctrine (at 32-33) to suggest that the Court may hold the Rule invalid even if it reflects the best interpretation of the statute. But these attempts to undermine the Rule are unavailing.

**1.** Plaintiffs cannot salvage their erroneous interpretation with the rule of lenity. At the outset, as the district court correctly concluded, *see* App. 667; R. Doc. 90, at 15, plaintiffs fail to identify any ambiguity—much less the "grievous ambiguity or

35

uncertainty" required to trigger the rule of lenity, *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotation omitted)—in the relevant statutory language. The statute states that a weapon is a "rifle" if it is "designed" and "intended" to be fired from the shoulder. Many statutes, including numerous criminal statutes, govern conduct based on a party's intent. Courts routinely apply those provisions, and plaintiffs point to no authority to support the remarkable proposition that an inquiry into intent is ambiguous and thus prohibited under the rule of lenity. The Rule articulates ATF's understanding of the best interpretation of that inquiry in this context, and the rule of lenity does not apply where, as here, the "traditional tools of statutory construction" support that reading. *Caron v. United States*, 524 U.S. 308, 316 (1998).

Rather than identify any specific ambiguity in the statute, plaintiffs argue that lenity must apply because—in plaintiffs' telling—ATF has shifted its position from one that said a braced weapon "would not be subject to" the NFA to one that "effectively render[s] all brace-equipped pistols short-barreled rifles." Br. 30-32 (emphasis and quotation omitted). But that argument fails on all levels.

As an initial matter, plaintiffs misstate both ATF's pre-Rule approach to the question and the approach reflected in the Rule, neither of which reflects a categorical view that braced weapons are, or are not, short-barreled rifles. ATF has concluded for many years that some firearms equipped with "braces" are short-barreled rifles— indeed, even before the Rule, ATF classified "the majority" of submitted samples as short-barreled rifles. *See* 88 Fed. Reg. at 6479 n.9, 6482-92. And the Rule makes clear

36

that, going forward, ATF does not believe all braced weapon designs will constitute short-barreled rifles; in fact, the Rule itself describes designs that would not be short-barreled rifles. *See id.* at 6529-30. Thus, far from reflecting some about-face by the agency, the Rule simply reflects ATF's attempt to refine and clarify its approach to the question of how to apply the statute to braced weapons.

In any event, a change in legal position alone does not invalidate a correct interpretive rule; otherwise, the agency would be consigned to a state of perpetual error. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156-57 (2000) ("[A]n agency's initial interpretation of a statute that it is charged with administering is not carved in stone." (quotation omitted)). Recognizing that ATF had been inconsistent across classifications, the Rule gives uniformly correct guidance to ensure proper application of the statute.

**2.** Plaintiffs' brief constitutional-avoidance argument (at 32-33) fails for similar reasons. First, the avoidance canon has no role here, because as explained, the statute is not "susceptible of more than one construction" after "ordinary textual analysis." *Saxton v. Federal Hous. Fin. Agency*, 901 F.3d 954, 959 (8th Cir. 2018) (quotation omitted).

Second, plaintiffs have not developed—in their complaint or in their briefing—any Second Amendment claim, *see* App. 662-63; R. Doc. 90, at 10-11, so there is no cause to think that the statute might "raise[] serious constitutional doubts" or require the court to decide a "constitutional question." *Clark v. Martinez*, 543 U.S. 371, 381

37

(2005). But regardless, the NFA's regulation of short-barreled rifles—including short-barreled rifles made from stabilizing braces—is no doubt constitutional. Like other NFA firearms, short-barreled rifles have long been regulated due to their "quasi-suspect character," *Staples*, 511 U.S. at 611-12, and Congress has found they can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395. Thus, the Supreme Court has twice affirmed that short-barreled shotguns are "dangerous and unusual weapons" not protected by the Second Amendment. Shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *United States v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are "dangerous and unusual" weapons. *District of Columbia v. Heller*, 554 U.S. 570, 581, 622-25, 627 (2008) (quotation omitted). As the courts of appeals have repeatedly concluded, that principle applies equally to short-barreled rifles, because there is "no constitutional distinction" between the two. *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam) (plain error review); *see also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008).

## C. The Rule Is Not Arbitrary and Capricious

Beyond their statutory claims, plaintiffs also contend that the Rule and the PowerPoint slides are arbitrary and capricious for a scattershot of reasons. But the "highly deferential" arbitrary-and-capricious standard provides only for "narrow"

38

review. *Foster v. U.S. Dep't of Agric.*, 68 F.4th 372, 379 (8th Cir. 2023) (quotation omitted). To clear that bar, agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Rule and the PowerPoint both meet that threshold, even assuming each is reviewable. *But see supra* pp. 19-23.

### 1. The Rule Reasonably Explains the Factors ATF Applies in Determining Whether a Weapon Is a Short-Barreled Rifle

At the outset, plaintiffs argue that the multifactor test articulated by the Rule is arbitrary and capricious, either based on (at 33-37) plaintiffs' assertion that the framework as a whole is "infinitely malleable" or based on (at 37-46) their attempt to critique individual factors. Neither line of argument succeeds.

**a.** Plaintiffs are incorrect to suggest that the Rule's multifactor framework is impermissibly "malleable." Although plaintiffs complain that the holistic test embodied in the Rule does not explain how the factors will be weighed in any particular case, an agency is free to apply "multi-factor standards" to make "totality-of-the-circumstances" determinations. *PDK Labs. Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *see also, e.g.*, *FedEx Freight, Inc. v. NLRB*, 816 F.3d 515, 521-22 (8th Cir. 2016) (upholding similar multi-factor, unweighted test). For such standards, an "agency is free to adopt a totality-of-the-circumstances test," even where "that test lacks a definite threshold or clear line of demarcation to define an open-ended term."

*Mississippi Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (quotation omitted). In such circumstances, to be reasonable, the agency "must simply define and explain the criteria the agency is applying." *Id.* (quotation omitted). And there is no doubt that the Rule meets that standard here. The Rule lays out the factors that ATF considers relevant to the statutory inquiry, and it contains a substantial explanation related to each identified category that explains why ATF believes that evidence is probative and how ATF will approach that specific evidence. *See* 88 Fed. Reg. at 6509-43.

Nor can plaintiffs rely on the agency's slideshows to manufacture error where none exists. Although plaintiffs argue (at 36) that the slideshows reflect ATF's "feeling no need to even explain itself" and complain that all the firearms on the slideshows are identified as short-barreled rifles, those arguments misunderstand the context of the slideshows. As explained, *see supra* pp. 10-11 & 11 n.1, ATF issued the slideshows to provide advance notice to the regulated public of certain common weapons it believed to be short-barreled rifles, and it intended to follow up the slideshows with detailed classification letters explaining each determination. Nothing about those slideshows reflects a belief that all possible braced weapon designs will be short-barreled rifles or that ATF need not explain its classification decisions.

The error in plaintiffs' argument is underscored by the context of the Rule, which proceeds from the statute's "comprehensible normative standard"—whether a

weapon is intended to be fired from the shoulder. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quotation omitted). Statutory intent standards, which are common in civil and criminal law, have a generally "settled legal meaning[]," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quotation omitted); *see also Village of Hoffman Estates*, 455 U.S. at 500-01 (rejecting vagueness challenge to "designed for use" standard), and plaintiffs point to no authority to suggest that such a focus on design and intent is itself improperly "malleable." And, moreover, the Rule—which does no more than interpret the statute—provides additional clarity by "defin[ing] and explain[ing] the criteria" ATF considers relevant to a party's intent. *Catawba County v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009) (per curiam).

Finally, plaintiffs' complaints are especially unavailing because plaintiffs fail to identify any firearm for which application of the Rule's framework is unclear. Plaintiffs' argument about the supposed malleability of the standard is, in essence, a contention that the Rule is impermissibly vague, but courts do not address such claims in a vacuum. Instead, a court must "consider whether a statute is vague as applied to the particular facts at issue," because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18-19 (quotation omitted). Plaintiffs have not identified any specific braced firearm for which it is unclear how the statute and Rule might apply. And to the extent that plaintiffs are uncertain about how ATF will classify any particular

41

braced firearm, they may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552. That ability to receive additional clarity "by resort to an administrative process" ameliorates any harm they might claim. *Hoffman Estates*, 455 U.S. at 498.

**b.** Beyond their general objection to the Rule's approach, plaintiffs nitpick (at 37-46) individual considerations as insufficiently determinative. None of those suggestions is persuasive.

First, plaintiffs fault the agency (at 37-40) for considering whether a weapon "provides surface area that allows [it] to be fired from the shoulder" but not creating a mathematical bright-line rule for the amount of surface area that would be sufficient. But ATF specifically addressed the choice to assess this factor qualitatively in the Rule and explained that it would "not attempt to precisely measure or quantify the surface area or make the determination based on the existence of any minimum surface area." 88 Fed. Reg. at 6529. That choice reflects the agency's permissible desire to have "flexibility and reasonable breadth rather than meticulous specificity." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016) (quotation omitted). Particularly in an area where the Rule is intended to address previous circumvention of the statute and where mathematically defined "regulations cannot begin to cover all of the infinite variety of conditions," *id.* (quotation omitted), ATF reasonably chose to avoid brightline rules subject to easy circumvention. And, once again, plaintiffs offer no

42

specific examples of braced firearms for which they are unsure how this factor would apply.

Plaintiffs' complaints (at 40-44) about how the agency considers the weight, length, and length of pull of the firearm against comparable rifles fare no better. Plaintiffs complain that the agency failed to provide "precise" metrics for these factors, but as explained, there is no basis for the idea that precise metrics—rather than a qualitative approach—are necessary in this context. Regardless, the Rule goes a long way to that end, providing many pages of figures for specific rifle and pistol variants to use as comparisons. 88 Fed. Reg. at 6514-18, 6535-37. Plaintiffs emphasize that the Rule fails to exhaustively identify which of the 12,000 rifles in ATF's database the agency will consider when determining whether a specific braced firearm has a weight, length, and length of pull "consistent with" rifles. But the Rule explains that for a weapon "marketed as a pistol that is a variant of a rifle," ATF will compare the braced firearm "against the original rifle design." *Id.* at 6518, 6535. And for a braced firearm that is not a rifle variant, ATF will compare against similar pistol variants designed to be fired from the shoulder (*e.g.*, a braced firearm made from a Glock-type pistol may be compared against "a Glock-type pistol with a shoulder stock"). *Id.* As with their other arguments, plaintiffs again ignore the substantial guidance provided by ATF and fail to identify even a single actual firearm for which uncertainty remains.

Appellate Case: 23-3230     Page: 52     Date Filed: 12/19/2023 Entry ID: 5346009

In addition, plaintiffs incorrectly suggest (at 42-44) that the Rule unreasonably considers whether a braced firearm has similar characteristics to a similar-model rifle because sometimes physical similarities are irrelevant. The length and weight of a firearm is clearly relevant to the question whether it is designed and intended to be fired from the shoulder—and the similarity of physical characteristics between a firearm made with a brace and one made with a stock is clearly probative of whether the braced firearm is intended as a circumvention of the NFA's requirements that would unquestionably apply if a stock were used. Regardless, the Rule explains at length why the specific characteristics that ATF has identified are relevant to the statutorily-required determination of design and intent. *See* 88 Fed. Reg. at 6514-37.

Finally, plaintiffs erroneously argue (at 44-46) that the Rule does not adequately explain how the agency will assess "the manufacturer's direct and indirect marketing and promotional materials" or the "use of the weapon in the general community." The Rule explains in depth that the agency will assess these sources to "verify the manufacturer's purported intent regarding the use [of] the weapon," describing the types of sources the agencies will consider and to what end. 88 Fed. Reg. at 6544.

### 2. The Rule Reasonably Considered Reliance Interests and Costs

Plaintiffs suggest (at 46-48) that the Rule is unreasonable because it failed to consider costs and reliance interests with respect to braces purchased between 2020

44

and 2022. As the district court correctly concluded, *see* App. 670-71; R. Doc. 90, at 18-19, those arguments are not persuasive.

As an initial matter, the Rule specifically discussed reliance interests, *see* 88 Fed. Reg. at 6507-08, and adopted compliance options tailored to ameliorate any burden on such interests, *see id.* at 6480-81. Indeed, in part to address such interests, the agency determined in its enforcement discretion to provide a window where such previous owners could register their braced firearms without paying the NFA's tax.

Nor is plaintiffs' argument regarding costs any more persuasive. Although ATF had imperfect data and could not quantify how many braces were sold between 2020 and 2022, the agency calculated costs using estimates of up to seven million braces in circulation—more than two times the estimated pre-2020 sales of three million braces—to "account for uncertainty." *See* ATF, Docket No. 2021R-08F, *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* 18 (Jan. 2023), https://perma.cc/96PV-KRB9. It is always "up to the Agency to decide . . . how to account for cost" within "the limits of reasonable interpretation." *Michigan v. EPA*, 576 U.S. 743, 759 (2015). And plaintiffs do not argue that ATF's estimates were unreasonable—much less that they were so unreasonable to overcome the "highly deferential" review of a cost-benefit analysis. *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 803-04 (8th Cir. 2021).

Regardless, plaintiffs cannot leverage their assertion of improper accounting of costs into an arbitrary-and-capricious claim. Unlike some other agencies, there is no

45

statute that requires ATF to consider the "economic implications" of the Rule. *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005); *cf. id.* at 142 (explaining that such an obligation existed in that case because the relevant statute provided that the SEC must consider "whether the action will promote efficiency, competition, and capital formation" (quotation omitted)).

In the absence of such a statute, an agency's cost-benefit analysis is only reviewable "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking." *Cigar Ass'n of Am. v. U.S. FDA*, 5 F.4th 68, 76 (D.C. Cir. 2021) (quotation omitted). Although ATF complied with internal directives from the Executive Branch to prepare and issue a cost-benefit analysis, the agency did not justify its decision to adopt the Rule on the basis of perceived economic benefits or costs. *See* 88 Fed. Reg. at 6572-73. To the contrary, the agency issued the rule because it was the best interpretation of the statute.

Finally, although plaintiffs briefly suggest that an enforceable requirement to properly quantify costs might be found in the statutory direction to promulgate regulations that are "needful" and "necessary," Br. 46 (quoting 26 U.S.C. § 7805(a); 18 U.S.C. § 926(a)), that suggestion is unavailing here. The agency promulgated the Rule to ensure that ATF will consistently use "the proper legal and factual analysis" in determining whether a braced firearm is subject to the NFA. 88 Fed. Reg. at 6502. That benefit alone is enough to justify the Rule because an agency's decision that a new interpretation is "more consistent with statutory language" always "justif[ies] its

46

policy choice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016) (quotation omitted). And that clarity is particularly important here, where (as explained) previous inconsistencies in application led to substantial confusion among the regulated public and so the Rule is required to "ensure the public's awareness of the Department's best interpretation of the relevant statutory provisions." 88 Fed. Reg. at 6559. Having concluded that the Rule reflects the best interpretation of the statute, it is "needful" and "necessary" for the agency to follow that statutory mandate—and to inform the regulated public of the agency's interpretation— regardless of the cost.

### 3. The PowerPoint Slides Are Not Improper

Plaintiffs are no more successful (at 50) in arguing, in a single paragraph, that the agency's slideshows are arbitrary and capricious. As previously explained, the slideshows are not reviewable final agency action. *See supra* p. 22-23; *see also* App. 673-74; R. Doc. 90, at 21-22. But in any event, the slideshows themselves are reasonable for the purpose that they serve—placing the public on notice that listed firearm-brace combinations are likely to be classified as short-barreled rifles under the Rule's considerations. Agency action is not inadequately explained where "the agency's path may reasonably be discerned." *Nebraska v. U.S. EPA*, 812 F.3d 662, 666 (8th Cir. 2016) (quotation omitted).

The slideshows were issued contemporaneously with the Rule to illustrate how the statute applied. Accordingly, the slideshows plainly incorporate the framework of

47

the Rule, including the Rule's emphasis on objective design features. *See* 88 Fed. Reg. 6514. These slideshows are replete with examples of firearms equipped with stabilizing braces that are virtually identical to acknowledged short-barreled rifles with stocks. Indeed, plaintiffs do not attempt to argue that it would be improper to classify any one of those braced firearms as a short-barreled rifle using the Rule's considerations. Instead, plaintiffs' only reference to a specific firearm depicted in the slideshows is to complain that one of the slideshows states that the following is a short-barreled rifle:

**AR-type Firearm with SB-Mini Attached – Short-barreled Rifle**



But plaintiffs develop no argument that that firearm is in fact not designed and intended to be fired from the shoulder nor do they explain how faithful application of the Rule's framework could lead to such a conclusion—perhaps for good reason, given the obvious similarity between that depiction and acknowledged short-barreled rifle designs. Because the agency's path can be reasonably discerned, and its tentative

48

conclusions have not been meaningfully challenged, there is no reason to overturn them.

Whatever the case, to the extent that the agency committed error when it posted these PowerPoint presentations on its website, that would not be a reason, *contra* Br. 51-52, to hold any part of *the Rule* unlawful. The proper remedy would simply be to remand any unexplained conclusions to the agency for further explanation or reconsideration.

## II.  Plaintiffs Have Not Established that the Equitable Factors Favor an Injunction.

### A.  Plaintiffs Have Not Demonstrated Irreparable Harm.

Plaintiffs have not demonstrated that they will suffer irreparable harm absent an injunction. To do so, plaintiffs must identify harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse*, 78 F.4th at 1017 (quotation omitted). The mere "possibility" of harm is not enough; plaintiffs "must prove that irreparable injury is likely in the absence of an injunction." *Id.* at 1017-18 (quotation omitted). None of the plaintiffs have demonstrated such harm.

SB Tactical: SB Tactical claims (at 52-54) that it is suffering irreparable harm because it has experienced substantially reduced sales following the Rule. But SB Tactical does not aver that the Rule imposes any obligations or costs on it directly. Instead, SB Tactical seems to suggest that its customers have reacted to the Rule by

choosing to purchase fewer products. But to establish harm even in the standing context, a plaintiff must show that its injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and quotation omitted). Making that showing is particularly challenging when an injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562 (quotation omitted). Here, neither ATF nor the Court has any ability to control the independent decisions of SB Tactical's potential customers to purchase or not purchase particular products. Any financial harm from those parties' choices is not irreparable harm tied to the Rule.

To the extent that SB Tactical's allegations of harm rest on the proposition that its customers want to purchase stabilizing braces only (or principally) to circumvent the NFA, that suggestion underscores ATF's determination that many of these manufactured "braces" are in fact designed for shoulder firing. Plaintiffs can hardly claim injury from their newfound inability to facilitate circumvention of federal law.

Moreover, the Rule makes clear that certain brace designs may reflect a firearm that is not intended to be fired from the shoulder. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." 88 Fed. Reg. at 6529-30. Or it might include "a feature intended specifically to prevent" shoulder firing, such as "a permanently

50

attached protrusion." *Id.* at 6530. Accordingly, if SB Tactical has chosen not to manufacture such designs, any financial harm it has experienced from its customers' desire not to purchase short-barreled rifles is self-inflicted and not irreparable. *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).

<u>States</u>: The States' claims of irreparable harm fare no better. The States note (at 54-55) that some of the NFA's requirements—though not its tax, *see* 26 U.S.C. § 5853—apply to short-barreled rifles made from arm braces owned by the States, and they assert that they may incur "[c]ompliance costs from surveying existing law enforcement inventories" to determine if they are subject to those requirements. But such "ordinary compliance costs are typically insufficient to constitute irreparable harm," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005), and the States provide no evidence to quantify those costs or support a conclusion that they are great and imminent burdens that justify equitable relief, *Morehouse*, 78 F.4th at 1017. The States' argument (at 55) that the Rule will harm their police forces by "[f]orcing law enforcement to catalog or dispense with their braces" fares no better; the NFA permits the States to own short-barreled rifles (and exempts them from the statute's tax) and they thus need not "dispense with" them if they find them useful for law enforcement.

Nor do the States' alternative contentions (at 55) that they may suffer harm because the Rule injures their citizens' safety or may cause the loss of "tourism monies" from individuals who would use braced weapons as part of their tourist

51

activities advance their case. Not only are both asserted harms far too underdeveloped and speculative to support injunctive relief, but the States cannot assert, "as *parens patriae*," their public-safety claims on behalf of their citizens "against the Federal Government," *Haaland v. Brackeen*, 559 U.S. 255, 294-95 (2023) (quotation omitted).

Richard Cicero: Individual plaintiff Richard Cicero has not demonstrated any cognizable or irreparable harm either. He asserts (at 56) that he is harmed because he cannot use pistols with a brace "unless he registers them and pays a fee," but that assertion of harm fails on multiple levels. For one, as the Rule makes clear, there are possible braced weapon designs that would not constitute short-barreled rifles, and he does not explain why he cannot use one of those designs. Regardless, the Rule provided him an opportunity to register any previously owned braced short-barreled rifles with no penalty and no tax. To the extent that he chose not to take advantage of that opportunity, any resulting harm is "self-inflicted" injury and "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (quotation omitted). And in any event, the NFA's requirements are themselves relatively minor— and its $200 tax, at least, does not constitute *irreparable* harm because an individual who pays the tax but believes the statute does not cover his weapon may request, or sue for, a refund. *See* 26 U.S.C. § 7422. Taking that together, plaintiff fails to demonstrate any "clear and present need for equitable relief." *Morehouse*, 78 F.4th at 1017 (quotation omitted). Finally, although he attempts to recast his harm as a

52

constitutional injury, he does not bring or develop any constitutional claim on the merits that could support that allegation of harm.

### B. The Balance of the Equities Favors the Government

Even assuming plaintiffs had demonstrated some irreparable harm, their minimal asserted harms could not outweigh the countervailing public interest in public safety and in regulatory clarity.

First, the Rule promotes regulatory clarity and consistency, as has been explained. *See supra* pp. 8-10, 46-47. ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Second, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces those

53

controls that Congress deemed necessary for public safety by preventing circumvention of the requirements.

### C. Any Injunction Must Be Limited to the Plaintiffs

Finally, even if plaintiffs had demonstrated an entitlement to relief pending appeal, they would not be entitled to a broad injunction. Fundamental constitutional and equitable principles require the Court to limit any injunction to specific plaintiffs whom the Court finds have demonstrated irreparable injury. *See Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (Article III); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (equity). As explained, that manifestly does not include any plaintiffs beyond SB Tactical, the States, or Cicero—the only plaintiffs to develop any arguments regarding irreparable injury—nor does it include, with respect to the States, anything beyond the weapons the States themselves claim to possess.

54

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MAC SCHNEIDER
*United States Attorney*

ABBY C. WRIGHT

*s/ Sean R. Janda*

SEAN R. JANDA
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

December 2023

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,992 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Sean R. Janda*
Sean R. Janda